PENOBSCOT INDIAN NATION,
Plaintiff,

v.

KEY BANK OF MAINE,
et al., Defendants.

Civ. No. 94–0212–B.

United States District Court,
D. Maine.

Oct. 25, 1995.

Stephen F. Gordon, Gordon & Wise, Boston, MA, Ronald C. Caron, Caron & Sullivan, Biddeford, Maine, for Plaintiff.

**16**

Peter W. Culley, Pierce, Atwood, Scribner, Allen Smith & Lancaster, Portland, Maine, for Defendant Key Bank.

Bernard J. Kubetz, Eaton, Peabody, Bradford & Veague, Bangor, Maine, for Defendant Bernstein Shur.

Stephen B. Wade, Skelton, Taintor & Abbott, Auburn, Maine, for Palmer Defendants.

Melissa A. Hewey, Drummond Woodsum, Plimpton & MacMahon, Portland, Maine, for Defendants SHC Corp. & Burlington.

Jeffrey A. Thaler, Berman & Simmons, P.A., Lewiston, Maine, for Defendant John Schiavi.

Leonard I. Sharon, Laskoff & Sharon, Lewiston, Maine, for Defendant Michael Marcello.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff, the Penobscot Indian Nation ("PIN"), filed a ten count complaint against nine Defendants, for claims arising out of a failed business venture.[1] PIN seeks declaratory judgement under 25 U.S.C. § 81, damages under state tort and contract theories, and civil RICO claims. Defendants Key Bank, CWC, Burlington, John Schiavi, John Palmer, Palmer Management, and Palmer Development move for Summary Judgement. Defendant SCH filed a Motion to Dismiss which, under the Court's Order of June 7, 1995, will be treated as a Motion for Summary Judgement. Only Defendant Bernstein has not filed a motion for summary judgement.[2]

Defendants Key Bank, John Schiavi and the Palmer Defendants (John Palmer, Palmer Management and Palmer Development) filed counterclaims against PIN for defamation and punitive damages. John Palmer also claims both negligent and intentional infliction of emotional distress and breach of contract (by Palmer and Palmer Management). Key Bank also files counterclaims against Michael Marcello, PIN's media consultant, and individual PIN members Reuben Phillips and Jerry Pardilla. Only Counterclaim Defendant Michael Marcello responded with a motion for summary judgement.

The Court now addresses: (1) Defendants' Motions for Summary Judgement on the original claims, (2) Defendant SCH's Motion for Summary Judgement, and (3) Counterclaim Defendant Marcello's Motion for Summary Judgement.

### I. Background

The Court construes the facts in the light most favorable to the nonmoving party. In 1986 PIN, a federally recognized sovereign Indian tribe, formed a limited partnership with Palmer Management for the purpose of buying the Schiavi Homes Corp. ("Schiavi Homes") from CWC. CWC previously acquired Schiavi Homes, a Maine corporation which marketed and sold mobile homes, from John Schiavi in 1983.

PIN invested in Schiavi Homes on the advice of Tribal Assets Management ("TAM"), an investment banking firm which advises both PIN and the Passamaquoddy Indian Tribe. TAM aided in the negotiations of both the Partnership Agreement with Palmer Management, as well as the final Asset Purchase Agreement with CWC. Under the Partnership Agreement, PIN, the limited partner, acquired a 90% interest in Schiavi Homes. Palmer Management, the

---

1. PIN brings this action against: (1) Key Bank of Maine ("Key Bank"), (2) Consumers Water Company ("CWC"), (3) SCH Corporation ("SCH"), (4) Burlington Homes of New England, Inc. ("Burlington"), (5) Bernstein, Shur, Sawyers and Nelson, P.C. ("Bernstein"), (6) John Schiavi, (7) John Palmer, (8) Palmer Management Corporation ("Palmer Management"), and (9) Palmer Development Corporation ("Palmer Development"). PIN sues for: (1) declaratory judgement under 25 U.S.C. § 81, (2) breach of duty of good faith and fair dealing (against CWC, SCH, Key Bank, John Schiavi, Burlington, Palmer Management and John Palmer), (3) breach of contract-

misrepresentation (against CWC, SCH, John Schiavi, Burlington and John Palmer), (4) fraud (against Bernstein), (5) negligence (against Bernstein), (6) breach of fiduciary duty (John Palmer and Palmer Management), (7) breach of fiduciary duty (against Key Bank), (8) breach of contract (against John Schiavi), and (9) RICO violations (against Key Bank, CWC, Burlington, Bernstein, John Schiavi, John Palmer, Palmer Management, Palmer Development).

2. Bernstein filed a Motion to Dismiss, which was denied on June 13, 1995.

sole general partner, received only a 10% stake, but gained full control over all management decisions. Key Bank financed the purchase on the condition that John Palmer retain full management control over Schiavi Homes. Palmer, an associate of John Schiavi, managed the company under CWC's ownership. As a prerequisite to financing the deal, Key Bank also required PIN to: (1) post a $1 million letter of credit to secure its loan, and (2) agree to restrictions on the withdrawal of funds. The Secretary of the Interior determined that the Partnership Agreement did not fall within 25 U.S.C. § 81, and therefore did not require approval. PIN now alleges that this agreement was a sham.

The Partnership attained two noncompetition agreements in connection with its purchase of Schiavi Homes. First, CWC assigned to the Partnership its interest in a noncompetitive agreement with John Schiavi. Additionally, John Palmer signed a noncompetitive agreement with the Partnership.

Schiavi Homes, prosperous under John Schiavi and CWC, experienced financial difficulties almost immediately after the sale to the Partnership. Consequently PIN was forced to make several additional investments in the Partnership. Over the course of three years PIN invested both land and money in Schiavi Homes. In October of 1987 PIN signed a Lease Agreement with the Partnership renting the "Holden Lot," PIN property, to the Partnership for the nominal consideration of $1 per year. The Lease Agreement also gave the Partnership the option to purchase the land for $100,000. Later the Partnership pledged the Lease Agreement to Key Bank, who ultimately sought to exercise the option to purchase.[3]

Although PIN continued to finance Schiavi Homes, the business never rebounded. Ultimately in April of 1989, with Schiavi Homes suffering severe financial difficulties, PIN decided, with the advice of its counsel, Bernstein, to liquidate Schiavi Homes. PIN and Palmer signed over the company's assets to Key Bank.

In addition to its financial problems, Schiavi Homes, under the Partnership, also experienced various legal difficulties. In an effort to resolve these matters PIN signed two Settlement Agreements in September of 1989. One agreement sought to resolve, among other issues: (1) Key Bank's action against PIN for the Holden property, (2) Schiavi Homes' suit against Burlington and Consumers for breach of their covenants not-to-compete, and (3) the foreclosure by Key Bank on the real property of Schiavi Homes.[4] The second agreement was more expansive in nature.[5] Both agreements, however, contain sweeping language and both explicitly sought to "release, remise and forever discharge all claims" among the signing parties. The validity of these Settlement Agreements lies at the heart of the present suit; PIN contests them both.

PIN's present suit arises from an investigation by the Penobscot County Sheriff Carl Andrews into alleged wrongdoings by Key Bank. Based on the improprieties allegedly revealed, PIN now attributes the failure of Schiavi Homes to continued mismanagement and self-dealing on the part of John Palmer, acting in collusion with John Schiavi, Key Bank and others. After reaching these conclusions, PIN held a press conference in September, 1994, to announce the filing of this lawsuit. The statements made at this press conference, stemming from PIN's complaint in this action, form the basis of defendants' counterclaims.

## II. Summary Judgement

 Summary judgment is appropriate in the absence of a genuine issue of any material fact, when the nonmoving party is entitled to a judgement as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine, for

---

3. PIN does not refute Defendant Key Bank's assertion that George Big Eagle, on behalf of B.D. Oh, the Area Director of the Eastern Area Office of the Bureau of Indian Affairs Division ("BIA") of the U.S. Department of the Interior, approved the transfer of the Holden Lot to Key Bank.

4. PIN, SCH, Palmer Management, John Palmer, Schiavi Homes, Key Bank, CWC, and Burlington signed this agreement, dated September 29, 1989.

5. PIN, John Schiavi, Palmer Management, John Palmer, Schiavi Homes, and Key Bank signed this agreement, dated September 29, 1989.

summary. judgement purposes, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material fact is one which has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir. 1993). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed.R.Civ.P. 56(c). On summary judgement, the moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1977). However, the Court views the record in the light most favorable to the nonmoving party. *FDIC v. Anchor Properties,* 13 F.3d 27, 30 (1st Cir.1994).

### III. Defendants' Motion for Summary Judgement

Defendants' Motion for Summary Judgement, as well as Plaintiff's objection, revolves chiefly around 25 U.S.C. § 81, the federal statute governing contracts with Indian tribes. PIN's tort and contract claims will survive only to the extent that this Court construes § 81 to invalidate the contracts at issue, specifically the Settlement Agreements.

The Court holds that the documents at issue fall outside the scope of the statute's language. Consequently, PIN's tort and contract claims fail given the binding force of the Settlement Agreements. The Court therefore grants Defendants' Motion for Summary Judgement as to Count I (declaratory judgement), Count II (breach of duty of good faith and fair dealing), Count III (breach of contract-misrepresentation), Counts VI and VII (breach of fiduciary duty), and Count VIII (breach of contract) as to all defendants. Count IX, PIN's RICO claim, is barred by the statute of limitations.

### A. Federal Indian Statutes

In Count I, Plaintiff seeks declaratory judgement that 25 U.S.C. § 81 applies to all the contracts at issue. The Court's analysis, however, deals primarily with the Settlement Agreements because, if valid, the relevancy of the remaining documents is immaterial and the remaining claims would be precluded by the binding force of the Settlement Agreements. Plaintiff argues, in short, that the Settlement Agreements, and indeed all of the agreements involved with PIN's purchase and control of Schiavi Homes: (a) fall within § 81, and (b) are therefore invalid because they were never properly approved by the Secretary of the Interior as required by the statute. Defendants, however, contend that the contracts at issue do not fall within the plain language of § 81, and even if they do, the Settlement Agreements are nonetheless valid because the Federal Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721–1735, preempts § 81.

### 1. 25 U.S.C. § 81

Congress passed § 81 in 1872 "to protect Indians from improvident and unconscionable contracts." *Altheimer & Gray v. Sioux Mfg. Corp.,* 983 F.2d 803, 805 (7th Cir.) (quoting *In re Sanborn,* 148 U.S. 222, 227, 13 S.Ct. 577, 579, 37 L.Ed. 429 (1893)), *cert. denied,* —— U.S. ——, 114 S.Ct. 621, 126 L.Ed.2d 585 (1993)). The statute requires the Secretary of the Interior to approve all contracts: (1) with an individual Indian or any tribe of Indians, (2) in consideration of services, (3) that are relative to Indian lands. 25 U.S.C. § 81. Failure to secure approval of such contracts renders them null and void—*ab initio. Id.; see, e.g., Inecon Agricorp. v. Tribal Farms, Inc.,* 656 F.2d 498, 500–501 (9th Cir.1981) (contract voided because not a contract with individual Indian or Indian tribe). The Supreme Court has consistently held that Indian statutes are to be construed "liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985); *see County of Yakima v. Yakima Indian Nation,* 502 U.S. 251, 112 S.Ct. 683, 693, 116 L.Ed.2d 687 (1992); *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 42, 63 L.Ed. 138 (1918).

■ Despite its harsh remedy and arguably antiquated rationale, § 81 remains in effect today. "Section 81 plainly puts all parties on notice that any contract that relates to tribal lands or funds is null and void without BIA approval." *A.K. Management Co. v. San Manuel Band of Mission Indians,* 789 F.2d 785, 788 (9th Cir.1986). Furthermore, "[u]ntil Congress repeals or amends the Indian ... statutes ... we must give them 'a sweep as broad as their language,' and interpret them in light of the intent of the Congress that enacted them." *Central Mach. Co. v. Arizona State Tax Comm'n,* 448 U.S. 160, 166, 100 S.Ct. 2592, 2596, 65 L.Ed.2d 684 (1980) (citations omitted). It is against this background that the Court now assess the validity of the Settlement Agreements.

#### a. Settlement Agreements

Despite Plaintiff's efforts to fit the Settlement Agreements under § 81, the statute is inapplicable. As noted, § 81 applies to contracts: (1) with an individual Indian or an Indian tribe, (2) for services, (3) relative to their Indian lands. 25 U.S.C. § 81. The Settlement Agreements, while effectively contracts with an Indian tribe, are neither contracts for services, nor contracts relative to Indian lands.

##### i. Contract with Indian Tribe

■ The Settlement Agreements pertain to Schiavi Homes as the signatory, as well as PIN itself, and are therefore contracts with an Indian tribe under 25 U.S.C. § 81. PIN, through its representative, signed both agreements. Defendants argue that the statute covers Indian tribes, and not their various business enterprises and corporate partnerships, and thus the agreements fall outside the purview of the statute. Plaintiff, however, contends that PIN and the Partnership are effectively interchangeable.

■ Courts look beyond the mere formality of corporate structure in construing the identity of parties with regard to § 81. *See Altheimer & Gray,* 983 F.2d at 809. In *Altheimer & Gray v. Sioux Mfg. Corp.,* the Seventh Circuit affirmed the District Court's determination that an Indian tribe, and its wholly owned manufacturing company were essentially indistinguishable, and thus a contract with the company was a contract with an Indian tribe under § 81. *Id.* To determine otherwise would in effect allow Indian tribes to evade Congressional intent at will by forming alternative entities, and thereby avoid the requirements of the statute. *See Pueblo of Santa Ana v. Hodel,* 663 F.Supp. 1300, 1306 (D.D.C.1987) (nonprofit instrumentality of Indian tribe came within the statute despite the tribe's efforts to classify it otherwise).

As in *Altheimer & Gray,* the contracts with the Partnership here, are effectively contracts with an Indian tribe. PIN owns a 90% share in Schiavi Homes, and provided the bulk of the financial backing for the Partnership. *See Inecon Agricorp.,* 656 F.2d at 501 (not a contract with Indian tribe because tribe had very limited role under the contract).

##### ii. Contract for Services

■ Section 81 also requires that the contract at issue be one involving "services," a term which does not encompass the import of the Settlement Agreements. Plaintiff, however, contends that such a narrow reading of the statute undermines Congressional intent.

While courts have construed § 81 liberally, they have not treated the term "services" as a mere catchall. In *U.S. ex rel. Harlan v. Bacon,* the Eighth Circuit ruled that a lease for sharecropping on Indian land did not constitute "services" as contemplated by § 81. 21 F.3d 209, 212 (8th Cir.1994). The court pointed to the variety of statutes which deal with Indian transactions, such as 25 U.S.C. § 177, the federal statute governing the lease of tribal land, to illustrate the Congressional intent to encompass only service contracts under § 81. *Id.* To do otherwise would make either § 81, or the various other statutes superfluous. *Id.* Similarly in *In re U.S. ex rel. Hall,* the district court held that contracts for gambling equipment did not constitute "services" under § 81, and more generally, that the provision did not govern sales contracts. 825 F.Supp. 1422, 1432 (D.Minn.1993), *aff'd,* 27 F.3d 572 (8th Cir. 1994), *cert. denied, Hall v. Creative Games*

*Technology, Inc.,* —— U.S. ——, 115 S.Ct. 1112, 130 L.Ed.2d 1076 (1995).

While PIN engaged in a variety of transactions during the course of its involvement with Schiavi Homes, the Settlement Agreements themselves do not constitute contracts for services. The Settlement Agreements rather pertain to the release of legal claims, an exchange, analogous in some regard to a sales contract. Section 81, therefore, does not apply to the Settlement Agreements, and the failure of the parties to gain secretarial approval does not invalidate the agreement.

### iii. Relative to Indian lands

■ Although the contract for service prong analysis removes the Settlement Agreements from the purview of the statute, the Court nonetheless notes that the Settlement Agreements are also exempt from § 81 under the relation to Indian lands requirement. Plaintiff argues that the Settlement Agreements deal with the Holden Lot under the Lease Agreement, as well as the pledge of that agreement to Key Bank, and therefore implicates Indian lands. The Court, however, analyzes the Settlement Agreements independently of the Lease Agreement, as the validity or invalidity of the latter does not bear on resolution of the former necessarily. *Cf. Narragansett Indian Tribe v. Ribo, Inc.,* 686 F.Supp. 48, 53 (D.R.I.1988) (documents inextricably tied together and thus analyzed together.)

*Altheimer & Gray* lends guidance to the "relative to Indian lands" inquiry. *See* 983 F.2d at 811. In *Altheimer & Gray,* the Seventh Circuit enumerated four considerations to aid in the determination as to whether a management contract is relative to Indian lands: "1) Does the contract relate to the management of a facility to be located on Indian lands? 2) If so, does the non-Indian party have the exclusive right to operate that facility? 3) Are the Indians forbidden from encumbering the property? 4) Does the operation of the facility depend on the legal status of an Indian being a separate sovereign?" *Id.* No single factor is dispositive in this determination. *Id.* And in this case no single factor is met. The Settlement Agreements deal with the disposition of the pending legal claims, not the transfer of Indian lands, nor the management, control, or particular status of those lands.

### b. Partnership Agreement, Asset Purchase Agreement, Lease Agreement, Pledge of Lease Agreement

■ Plaintiff also challenges, under § 81, the validity of the original Asset Purchase Agreement, the Partnership Agreement, the Lease Agreement, and the pledge of the Lease Agreement to Key Bank. However, given the Court finds that the Settlement Agreements are valid, it is unnecessary to test the validity of these documents. Any suits arising out of these agreements would necessarily be precluded by the releases contained in the Settlement Agreements.

### 2. Federal Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721–1735

Similarly given the Court's determination that the Settlement Agreements survive § 81, we need not address the effect of 25 U.S.C. §§ 1721–1735, the Federal Maine Indian Claims Settlement Act, on § 81. The Court expresses no opinion as to the merits of Defendants' claim on these grounds.

### B. Tort and Contract Claims

■ The Settlement Agreements, a valid release, bar PIN's tort and contract claims, Counts II, III, VI, VII, and VIII. "It is beyond cavil that a suit can be barred by the earlier settlement of another suit in either of two ways: res judicata or release." *Nottingham Partners v. Trans–Lux Corporation,* 925 F.2d 29, 32 (1st Cir.1991). Maine courts both encourage settlements, *Norton v. Benjamin,* 220 A.2d 248, 252 (Me.1966), and recognize the binding force of releases, *LeClair v. Wells,* 395 A.2d 452, 453 (Me.1978) ("a valid release will extinguish a cause of action ..."). The Supreme Judicial Court of Maine noted: "[w]here the contract is in the nature of a full settlement and a release of all claims for a consideration agreed upon, one may discover on the basis of hindsight the unwisdom of his bargain. But the law deems that society gains most from the certainty and finality of such agreements...." *Norton,* 220 A.2d at 251.

Maine law also recognizes the preclusive effect of settlements. *Butters v. Kane*, 347 A.2d 602, 604 (Me.1975). *Accord Anderson v. State*, 147 Vt. 394, 518 A.2d 360, 361 (1985). Here the language of the Settlement Agreements are clear. The signatories to one of the two agreements, PIN, SCH, Palmer Management, Schiavi Homes, Key Bank, CWC, and Burlington agreed to unequivocally:

> release, remise and forever discharge each other, from all actions, causes of actions, claims and demands whatsoever ... and from all suits ... at law or in equity ... up to and including the day of the date of this release which directly or indirectly relates to the Schiavi Loan Transaction, the Asset Purchase Agreement ... the liquidation of Schiavi assets and any other transactions, dealings, or agreements (written or oral) among each other with respect thereto. (1989 Settlement Agreement).[6]

Interpretation of unambiguous contractual language is an issue of law, for which the Court is responsible. *Fowler v. Boise Cascade Corp.*, 739 F.Supp. 671, 673 (D.Me. 1990), *aff'd*, 948 F.2d 49 (1st Cir.1991); *People's Heritage Savings Bank v. Recoll Management, Inc.*, 814 F.Supp. 159, 162 (D.Me. 1993). Here the language is clear, and the effect is straightforward: the parties have explicitly released one another from future legal battles on these issues. PIN cannot now escape from the broad reach of this agreement.

Because PIN released its tort and contract claims under the Settlement Agreement, the Court need not consider the alternative theories of res judicata and statute of limitations which might also have precluded these claims.

## C. RICO

PIN's RICO claims are time-barred. Civil RICO claims carry a four-year statute of limitations as provided by the Clayton Act, 15 U.S.C. § 15. *Agency Holding Corp. v. Malley Duff & Assocs.*, 483 U.S.

143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The statute accrues from the date the Plaintiff discovered, or should have discovered his or her injury. *Rodriguez v. Banco Central Corp.*, 917 F.2d 664, 666 (1st Cir.1990) (endorsing Second Circuit's decision in *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir.1988), *cert. denied, Soifer v. Bankers Trust Co.*, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989)). Injury under RICO relates to injury to the party's "business or property." *Bankers Trust*, 859 F.2d at 1103.

In the case at bar, the injury in question is PIN's business losses from the demise of Schiavi Homes, which transpired over a three-year period from the purchase date in 1986 to its liquidation in 1989. At the very latest, on September 29, 1989, the date PIN signed the Settlement Agreements, PIN knew of Schiavi Homes' losses. Consequently PIN's RICO claims would be actionable only until September, 1993. PIN filed this action on September 14, 1994. This claim is therefore time-barred.

## IV. SCH's Motion for Summary Judgement

SCH, a Maine Corporation, and defendant in Counts II (breach of good faith and fair dealing), III (breach of contract—misrepresentation) and IX (RICO), previously filed a Motion to Dismiss in this case. In response to this motion, the Court denied Plaintiff's demand to strike SCH's Articles of Dissolution, however, the Court granted Plaintiff's request to have SCH's Motion to Dismiss treated as a Motion for Summary Judgement.

SCH dissolved on August 8, 1990. It seeks summary judgement on two grounds: (1) improper service and, (2) the statute of limitations relating to dissolved corporations. However because SCH was also a party to one of the 1989 Settlement Agreements, which released the parties from any pending or future suits in relation to the Schiavi Homes transactions, the present claims are barred. The Court need not consider the

---

6. The second of the two Settlement Agreements contains almost identical language, and was signed by PIN, John Schiavi, Palmer Management, John Palmer, Schiavi Homes and Key Bank.

alternate grounds on which SCH seeks summary judgement.

### V. Plaintiff's Motion for Summary Judgement on Counterclaims

Defendants John Schiavi, Key Bank, and the Palmer Defendants (John Palmer, Palmer Development and Palmer Management) filed counterclaims on a variety of state law theories including defamation, punitive damages, and emotional distress against PIN, its media consultant, Michael Marcello, and PIN representatives, Reuben Phillips and Jerry Pardilla. The basis for these claims were statements made at PIN's press conference announcing the filing of PIN's suit. According to Key Bank, PIN, through its representatives claimed:

(1) "That [PIN] is a 'victim' of or had been 'victimized' by Key Bank and others;"

(2) "That 'money . . . had been stolen from [PIN]' by Key Bank and others;"

(3) "That the action was being brought against Key Bank because Key Bank 'conspired and acted to defraud the Penobscot Nation;' "

(4) "That 'the conduct of Key Bank . . . resulted in the Penobscot Nation entering into an improvident and unconscionable partnership investment' under which it 'relinquished its right, its land, and its money to those who plundered the Penobscot Nation, lied to the Penobscot Nation and its members, and stole from the Penobscot Nation and its members;' "

(5) "That 'the bad acts, fraud, and bad faith committed by Key Bank . . . against the Penobscot Nation is a far greater conspiracy than could have been outlined in the press conference' and";

(6) "That the Penobscot Nation has 'suffered grave financial losses and later learned that they have been victimized manipulated, lied to, and used by Key Bank.' "

(Def.Ans. p. 15).

The Court now considers Defendant Michael Marcello's Motion for Summary Judgement against Key Bank, as to its defamation and punitive damages counterclaims.

### A. Defamation

A cause of action for common law defamation requires a showing of:

(a) a false and defamatory statement concerning another;

(b) an unprivileged publication to a third party;

(c) fault amounting at least to negligence on the part of the publisher, and;

(d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Lester v. Powers,* 596 A.2d 65, 69 (Me.1991) (citing *Restatement (Second) of Torts,* § 558 (1977).

First Amendment principles constrain the parameters of state law defamation claims. *New York Times Co. v. Sullivan,* 376 U.S. 254, 283–84, 84 S.Ct. 710, 727–28, 11 L.Ed.2d 686 (1964). The Supreme Court has adopted a two-tiered approach to defamation, establishing different standards for public and private actors. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342–48, 94 S.Ct. 2997, 3008–11, 41 L.Ed.2d 789 (1973). The First Amendment requires proof of "actual malice" to establish defamation against a public official. *New York Times,* 376 U.S. at 280, 84 S.Ct. at 726. Actual malice requires knowledge that the statements at issue were false or made with reckless disregard of whether they were false or not. *Id.* States, however, are free to employ more lenient standards for defamation against private figures. *Gertz,* 418 U.S. at 347, 94 S.Ct. at 3010. Maine has adopted the aforestated negligence standard. *Lester v. Powers,* 596 A.2d at 69.

Ordinarily when faced with a defamation claim the Court must analyze the plaintiff's status under prevailing First Amendment principles, and then apply the appropriate standard dictated by that determination. In the case at bar the parties dispute whether Key Bank, in its corporate entity, constitutes a public figure for limited purposes. Here, however, this analysis is unnecessary given the Court's determination that Key Bank

fails to allege facts that would establish even the lower negligence standard afforded to private citizens in defamation claims.

■■■ At issue here is the requisite mental state, negligence. According to the Restatement: "the standard of conduct to which [the party] must conform to avoid being negligent is that of a reasonable man under like circumstances." *Restatement (Second) of Torts* § 283; *see also* W. Page Keeton, Dan Dobbs, Robert Keeton and David Owen, *Prosser & Keeton on The Law of Torts,* § 32 (1984) (negligence standard defined by the reasonable person, a person of ordinary prudence, a person of reasonable prudence, or some other blend of reason and caution).

■■■ The facts here do not support Key Bank's allegations that Marcello acted negligently. Marcello did little more than read the substance of PIN's complaint to the print and broadcast media at PIN's press conference. At most, Marcello used more colorful adjectives and common parlance to describe PIN's legal claims. Nonetheless his assertions were clearly grounded in PIN's complaint. Marcello's use of the terms "lied to," "manipulated," and "cheated" simply describe PIN's legal causes of action for fraud and breach of contract. Marcello had no reason to suspect the veracity or legitimacy of PIN's allegations which were ultimately filed in court as a public document. Nor has Key Bank brought to the attention of this Court anything which would make such reliance negligent. Key Bank has at no time asserted that PIN's claims were frivolous, yet it aims to hold Marcello, PIN's messenger, responsible for this very offense. Even assuming, as Key Bank asserts, that Marcello harbors some ill will or bias against Key Bank due to his prior employment by Joseph Ricci and Catherine Petit, both of whom were involved in litigation against Key Bank, the Court still maintains that it was reasonable for Marcello to rely on the veracity of PIN's complaint.

■■■ While courts have held that summary judgement is generally inappropriate in cases involving negligence, this rule is not absolute. *Dobb v. Baker,* 505 F.2d 1041, 1043–44 (1st Cir.1974) (upholding summary judgment for defendant where "there was nothing to support a finding of negligence"); *see Moore's Federal Practice,* § 56.17; Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 10A *Federal Practice and Procedure* § 2729 (1983). Even with regard to negligence, summary judgement is proper when the facts in question are undisputed and only one conclusion can reasonably be drawn. *Taylor v. Gallagher,* 737 F.2d 134, 137 (1st Cir.1984). In such a case negligence becomes a matter of law. *Id.*[7]

■■■ This case poses one of those unusual situations where summary judgement is appropriate on the issue of negligence, for there is "nothing to be tried." *Bland v. Norfolk and Southern R.R. Co.,* 406 F.2d 863, 866 (4th Cir.1969). Construing the facts in the light most favorable to the nonmoving plaintiff, no reasonable juror could conclude that Marcello's action constitutes defamation. *Cf. Cerrito v. Time, Inc.,* 449 F.2d 306, 307 (9th Cir.1971) (affirming summary judgement on grounds that plaintiff did not establish malice in libel claim). Summary judgement is nonetheless proper where: "the plaintiff has the burden of proof on an essential element at trial and it is clear that the defendant would have been entitled to a directed verdict at trial if the plaintiff presented no more evidence than was before the court … on … summary judgement." *Guiggey v. Bombardier,* 615 A.2d 1169, 1171 (Me.1992) (citing *H.E.P. Development Group, Inc. v. Nelson,* 606 A.2d 774, 775 (Me.1992)).

Given the facts surrounding the other defamation claims mirror those in Key Bank's complaint, the Court now grants summary judgement on those claims as well.

**B. Punitive Damages**

■■■ In Maine punitive damages are only available on tortious conduct upon a clear

---

7. Maine law also supports the proposition that in certain circumstances summary judgement is appropriate on the issue of negligence. For example, in *Lorfano v. Dura Stone Steps, Inc.* the Maine Supreme Judicial Court recently granted summary judgement on a strict liability claim, which the court noted was "really nothing more than a ground of negligence liability." 569 A.2d 195, 196 (Me.1990) (at issue was the reasonableness of the defendant's conduct).

and convincing showing of malice. *Tuttle v. Raymond,* 494 A.2d 1353, 1361–63 (Me.1985); *see also* Donald N. Zillman, Jack H. Simmons, David D. Gregory, *Maine Tort Law* § 19.07 (1994). In *Tuttle v. Raymond* the Supreme Judicial Court of Maine held that:

> [a] standard that allows exemplary [or punitive] awards based upon gross negligence or mere reckless disregard of the circumstances overextends the availability of punitive damages and dulls the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct.

494 A.2d at 1361. While there are no motions on this count, based on the Court's finding with regard to the defamation claims, the Court now finds that summary judgement is also appropriate on all of punitive damages counterclaims as well.

### V. Conclusion

Federal law provides a vast array of protections for Native Americans, in an effort to right past transgressions. However these protections are not without parameters. Section 81, for example, covers only contracts with Indians or Indian tribes, for services, relative to Indian lands. The contracts at issue in this case do not fall within these boundaries, and are therefore not governed by this statute.

The Court notes for administrative purposes that the only issues remaining unresolved after the issuance of this order are: (1) Plaintiff's claims against Bernstein for negligence, Count IV, and fraud, Count V; and (2) Defendant John Palmer's counterclaims against PIN for negligent and intentional infliction of emotional distress, and breach of contract (by Palmer and Palmer Management).

For the reasons stated above, it is therefore *ORDERED* as follows:

(1) Defendants' Motion for Summary Judgement is *GRANTED* on Counts I, II, III, VI, VII, VIII and IX;

(2) Plaintiff Marcello's Motion for Summary Judgement is *GRANTED* on Counterclaims Counts I and II, and the other defamation and punitive damages claims brought by Key Bank, John

Schiavi and the Palmer Defendants are also dismissed.