112 F.3d 538
 65 USLW 2752
 PENOBSCOT INDIAN NATION, Plaintiff, Appellee,
v.
KEY BANK OF MAINE, et al., Defendants, Appellees,
John Palmer, Palmer Management Corporation, and Palmer
Development Corporation, Appellants.
PENOBSCOT INDIAN NATION, Plaintiff, Appellant,
v.
KEY BANK OF MAINE, et al., Defendants, Appellees.
PENOBSCOT INDIAN NATION, Plaintiff, Appellee,
v.
KEY BANK OF MAINE, et al., Defendants, Appellees.
John Schiavi, Appellant.
PENOBSCOT INDIAN NATION, Plaintiff, Appellee,
v.
KEY BANK OF MAINE, Defendant, Appellant.
 Nos. 96-1670 to 96-1672, 96-1736.
 United States Court of Appeals,
First Circuit.
 Heard Dec. 3, 1996.
Decided May 5, 1997.
 
 Peter J. Haley, with whom Stephen F. Gordon, Gordon & Wise, Boston, MA, Ronald C. Caron, and Caron & Sullivan, Biddeford, ME, were on brief for appellant Penobscot Indian Nation and third-party defendants-appellees, Gerald Pardilla and Reuben Phillips.
 Catherine R. Connors, with whom Debra Brown and Pierce Atwood, Portland, ME, were on brief for appellee and cross-appellant Key Bank of Maine.
 Justin W. Leary, with whom Leonard I. Sharon and Sharon, Leary & Detroy, Auburn, ME, were on brief for appellee Michael Marcello.
 Stephen B. Wade with whom Skelton, Taintor & Abbott, Auburn, ME, was on brief for defendants-appellees and cross-appellants, John Palmer, Palmer Management Corp., and Palmer Development Corp.
 Jeffrey A. Thaler with whom Berman & Simmons, P.A., Lewiston, ME, was on brief for defendant-appellee and cross-appellant, John Schiavi.
 Melissa A. Hewey with whom Drummond Woodsum & MacMahon, Portland, ME, was on brief for appellees Consumers Water Company, Burlington Homes of New England, Inc., and SHC Corporation.
 Before SELYA and STAHL, Circuit Judges, and WOODLOCK,* District Judge.
 STAHL, Circuit Judge.
 
 
 1
 Appellant, a federally-recognized Indian tribe, appeals the district court's denial of its motion for declaratory judgment, pursuant to 25 U.S.C. § 81, seeking to invalidate several agreements concerning the purchase and operation of a mobile home business. Appellees cross appeal the district court's summary judgment ruling in favor of Appellant on several defamation counterclaims as well as a breach of contract and emotional distress counterclaim stemming from litigation involving the failure of this same mobile home business.
 
 Background
 
 2
 Although the district court provided a cogent summary of the facts and procedural history in its memorandum opinion below, see Penobscot Indian Nation v. Key Bank, 906 F.Supp. 13, 16-17 (D.Me.1995), the complexity of this case compels us to sketch the necessary background information.
 
 
 3
 In 1983, Consumers Water Company ("CWC") acquired Schiavi Homes Corporation ("SHC"), a profitable Maine mobile home sales business, from John Schiavi ("Schiavi"). Under CWC's ownership, SHC continued to operate successfully. In 1985, John Palmer ("Palmer") became SHC's new president. In August 1985, Palmer and his wife, Mary Anna, also founded Palmer Development Corporation ("Palmer Development"). Like SHC, Palmer Development engaged in the sale of mobile homes throughout Maine.
 
 
 4
 In 1985, the Penobscot Indian Nation ("PIN") hired Tribal Assets Management ("TAM") to locate, evaluate, and recommend potential investment opportunities. Late in 1986, TAM identified SHC as a potential PIN investment and conducted a detailed analysis of SHC's viability as a successful business venture. TAM alerted PIN that SHC constituted a good investment possibility, but cautioned PIN that the success of the venture would depend largely on PIN's willingness to invest in new mobile home sites on which the mobile homes it sold to retail customers could be located. PIN expressed its willingness to use its lands and invest its resources for such purposes.
 
 
 5
 On December 31, 1986, PIN and Palmer Management Corporation ("Palmer Management"), a corporation formed for the purpose of purchasing SHC, executed a Partnership Agreement creating Schiavi Homes ("Schiavi Homes" or "the Partnership"), a Maine limited partnership. Pursuant to the Partnership Agreement, PIN became the sole limited partner and Palmer Management the sole general partner.[1] PIN acquired a ninety percent interest in Schiavi Homes. Palmer Management received only a ten percent share but secured full control over all management decisions.
 
 
 6
 Also on December 31, 1986, the Partnership executed a Purchase and Sale Agreement with SHC, which provided for the Partnership's purchase of SHC's assets and business for approximately $5 million. Key Bank of Maine ("Key Bank") financed the purchase on the condition that Palmer retain full management control over Schiavi Homes. Key Bank also insisted that PIN post a $1 million letter of credit to secure its loan and agree to restrictions on the withdrawal of funds from Schiavi Homes.
 
 
 7
 As part of its purchase of SHC, the Partnership secured three non-competition agreements. CWC entered into a non-competition agreement with Schiavi Homes and assigned to the Partnership its interest in an existing non-competition agreement with Schiavi, which it obtained at the time it originally acquired the business. Palmer signed a similar agreement with the Partnership.
 
 
 8
 Schiavi Homes fared poorly from its inception. Although sales of mobile homes in Maine reached an all time high during this time, by the end of 1987 Schiavi Homes' market share had declined from eighteen to eight percent. Over the course of its three year existence, PIN made several investments in Schiavi Homes in an attempt to buoy its business fortunes. Most significantly, in October 1987, PIN signed a Lease-Option Agreement with Schiavi Homes leasing for the nominal fee of $1 per year a twenty-four acre tract of real property (the "Holden Lot") that PIN purchased during this same month. The Lease-Option Agreement afforded the Partnership the option to purchase the Holden Lot for $100,000. PIN subsequently invested approximately $135,000 to develop the Holden Lot for purposes of the Schiavi Homes business. In December 1988, with Schiavi Homes unable to make its regular monthly loan payment of principal and interest to Key Bank, the Partnership pledged the Lease-Option Agreement to Key Bank.
 
 
 9
 In April 1989, acting on the advice of its counsel, Bernstein, Shur, Sawyer & Nelson ("Bernstein"), PIN decided to liquidate Schiavi Homes. As part of the liquidation plan, PIN and Palmer then assigned Schiavi Homes' assets to Key Bank. In May 1989, Key Bank notified PIN that it intended to exercise the purchase option contained in the Lease-Option Agreement.[2] At this time, Key Bank also initiated three foreclosure actions with respect to real property that the Partnership owned and encumbered with mortgage deeds given to Key Bank in conjunction with the initial financing of SHC's purchase.
 
 
 10
 On September 29, 1989, PIN entered into two comprehensive Settlement Agreements with Schiavi, SHC, Schiavi Homes, Palmer, Palmer Management, Key Bank, Burlington Homes of New England[3] ("Burlington Homes"), and CWC (collectively "Appellees"). PIN, Schiavi Homes, Schiavi, Palmer, Palmer Management, and Key Bank executed the first Settlement Agreement ("first Settlement Agreement"); PIN, Schiavi Homes, SHC, Palmer, Palmer Management, Key Bank, CWC, and Burlington Homes executed the second Settlement Agreement ("second Settlement Agreement"). The two agreements contained identical language that served broadly to "release, remise and forever discharge" all claims involving the signatories. Subsequent to the signing of the two Settlement Agreements, legal proceedings deriving from the operation of Schiavi Homes ceased.
 
 
 11
 The ensuing period of calm ended on September 14, 1994, when PIN filed the lawsuit underlying this appeal. PIN's suit stemmed from an investigation of Key Bank's activities relating to Schiavi Homes that Penobscot County Deputy Sheriff Carl Andrews conducted between approximately 1993 and 1994.[4] PIN alleges that Andrews' investigation revealed substantial improprieties on the part of PIN's business associates in the Schiavi Homes venture. Also on September 14, 1994, PIN held two press conferences, one in Bangor, Maine, and one in Portland, Maine, to announce the filing of its lawsuit in federal district court. Michael Marcello, PIN's media relations consultant, prepared the statements that PIN Governor Reuben Phillips and PIN Lieutenant Governor Gerald Pardilla read at the two press conferences. Marcello also distributed the text of the statements to members of the media.
 
 
 12
 PIN's complaint contained nine counts and named nine defendants. Most importantly for our purposes, the complaint alleged that the two Settlement Agreements signed by PIN and the Appellees were void because they did not receive the Secretary of the Interior's approval pursuant to 25 U.S.C. § 81.[5] SHC filed a motion to dismiss PIN's claims. Key Bank, Schiavi, Palmer, Palmer Development, Palmer Management, CWC, and Burlington Homes moved for summary judgment.
 
 
 13
 Palmer, Palmer Development, Palmer Management (the "Palmer Defendants"), Key Bank, and Schiavi filed counterclaims against PIN for defamation and punitive damages based on the alleged defamation stemming from the September 14, 1994 press conferences. Key Bank filed counterclaims for defamation against Marcello, Phillips, and Pardilla. Also deriving from these press conferences, Palmer asserted counterclaims against PIN for intentional and negligent infliction of emotional distress. Both Palmer and Palmer Management filed counterclaims against PIN for breach of contract, alleging that PIN's suit violated the release contained in the Settlement Agreements. Only Marcello responded with a motion for summary judgment.
 
 
 14
 The district court (Brody, J.) concluded that 25 U.S.C. § 81 did not apply to the Settlement Agreements. Determining that the Settlement Agreements constituted valid releases, the district court granted summary judgment for the defendants with respect to all of PIN's claims. See Penobscot Indian Nation, 906 F.Supp. at 20-21. Treating SHC's motion to dismiss as a motion for summary judgment, the district court separately granted summary judgment for SHC based on the binding nature of the Settlement Agreements. See id. at 21-22. The district court also ruled that the statute of limitations barred PIN's RICO claims. See id. at 21.
 
 
 15
 The district court then considered the counterclaims. Finding that Key Bank did not allege facts demonstrating even negligence on Marcello's part, the district court granted Marcello's motion for summary judgment on Key Bank's defamation counterclaim. See id. at 23. Despite the fact that only Marcello filed a motion for summary judgment, the district court proceeded to grant summary judgment sua sponte for PIN and the remaining cross-Appellees with respect to the defamation claims.[6] See id. Judge Brody also awarded summary judgment sua sponte for PIN and the other cross-Appellees on the punitive damage counterclaims. See id. at 24. Finally, the district court granted PIN's motion for summary judgment with respect to the emotional distress and breach of contract claims. See Penobscot Indian Nation v. Key Bank, Civ. No. 94-0212-B (D.Me. Dec. 13, 1995).
 
 
 16
 In the spring of 1996, PIN's malpractice claims against Bernstein went to trial before a jury. The jury returned a verdict in favor of Bernstein. The district court then entered a final judgment resolving all claims on May 7, 1996. These appeals ensued.[7]
 
 Standard of Review
 
 17
 The district court must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "On appeal from the entry of summary judgment we review the district court's decision de novo, construing the record in the light most ... [favorable] to the non-movant and resolving all reasonable inferences in that party's favor." Hachikian v. FDIC, 96 F.3d 502, 504 (1st Cir.1996). We are not "wedded to the district court's reasoning. Rather, '[w]e are free, on appeal, to affirm a judgment on any independently sufficient ground.' " Garside v. Osco Drug, Inc., 895 F.2d 46, 49 (1st Cir.1990) (quoting Polyplastics, Inc. v. Transconex, Inc., 827 F.2d 859, 860-61 (1st Cir.1987)).
 
 Discussion
 
 18
 This appeal raises several issues which we address in turn. We begin by resolving an issue of first impression in this Circuit: whether 25 U.S.C. § 81 applies to agreements relative to lands that an Indian tribe purchases in fee simple for investment purposes. We then determine whether PIN's filing of this action in 1994 constituted an actionable breach of contract. Subsequently, we decide whether the district court erred in concluding that the statements Marcello prepared and individual PIN officials announced to the press in September 1994 did not amount to defamation. Thereafter, we touch upon the issue of whether PIN's conduct at the press conferences constituted either intentional or negligent infliction of emotional distress. Finally, we evaluate whether the district court has jurisdiction to hear the remaining state law claims at issue in this case.
 
 A. Section 81
 
 19
 PIN sought a declaratory judgment from the district court that the agreements it executed with the Appellees necessitated approval from the Secretary of the Interior pursuant to 25 U.S.C. § 81. Section 81 states in pertinent part:
 
 
 20
 No agreement shall be made by any person with any tribe of Indians ... for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands ... unless such agreement be executed and approved as follows:
 
 
 21
 ....
 
 
 22
 It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Lands indorsed upon it.
 
 
 23
 ....
 
 
 24
 All contracts or agreements made in violation of this section shall be null and void....
 
 
 25
 Congress adopted § 81, originally Revised Statute § 2103, in 1872. To this day, Congress has not repealed § 81 and the few amendments to its text have been only technical. See Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d 803, 805 (7th Cir.1993).[8]
 
 
 26
 Section 81 dictates that any agreement within its purview that is not approved by the Secretary of the Interior ("the Secretary") is void ab initio. PIN insists that § 81 applies not only to the two Settlement Agreements, but also to the agreements pertaining to the creation and operation of Schiavi Homes, specifically the Asset Purchase Agreement, the Partnership Agreement, and the Lease-Option Agreement. PIN therefore reasons that the Settlement Agreements, the Purchase and Sale Agreement, and the Lease-Option Agreement are not binding. PIN also contends that the Secretary improperly determined that § 81 did not apply to the Partnership Agreement.
 
 
 27
 Significantly, if the Settlement Agreements are not valid because they never received the Secretary's approval pursuant to § 81, PIN may pursue its remaining claims against the Appellees. If, on the other hand, the Settlement Agreements do not fall within the parameters of § 81, PIN concedes that its remaining non- § 81 claims fail due to the binding nature of the Settlement Agreements. We therefore begin our analysis by evaluating the applicability of § 81 to the Settlement Agreements.
 
 1. Settlement Agreements
 
 28
 Without regard to § 81, the two Settlement Agreements constituted valid releases. Both Settlement Agreements provided that the parties "release, remise and forever discharge each other ... from all suits ... at law or in equity ... which directly or indirectly relate[ ] to ... any ... transactions ... among each other." Whether or not § 81 pertains to and thus voids the Settlement Agreements depends upon whether either or both constitute an agreement with an Indian tribe for services relative to Indian lands. See 25 U.S.C. § 81.
 
 
 29
 a. Agreement with an Indian Tribe
 
 
 30
 The Appellees contend that the Partnership, rather than PIN in its individual capacity, represents the applicable entity in this case. This argument is unavailing. PIN's Lieutenant Governor signed both Settlement Agreements as PIN's personal representative, not as the Partnership's Limited Partner. John Palmer, the Partnership's General Partner, signed on behalf of Schiavi Homes. Moreover, even if Schiavi Homes, not PIN in its individual capacity, signed the agreements, the district court's observation that "[c]ourts look beyond the mere formality of corporate structure in construing the identity of parties with regard to § 81," Penobscot, 906 F.Supp. at 19, necessitates no elaboration on our part. See Altheimer & Gray, 983 F.2d at 809-10; Pueblo of Santa Ana v. Hodel, 663 F.Supp. 1300, 1306 (D.D.C.1987).
 
 
 31
 b. Services
 
 
 32
 The district court ruled that "the Settlement Agreements themselves do not constitute contracts for services. The Settlement Agreements rather pertain to the release of legal claims...." Penobscot, 906 F.Supp. at 20. This conclusion aptly describes the first Settlement Agreement, which made no reference to any service to be performed by any party to the Agreement for any other party to the Agreement. The first Settlement Agreement, consequently, did not involve services.
 
 
 33
 The second Settlement Agreement contains a provision obligating Key Bank to "jointly [with PIN] seek a purchaser for the Holden Lot[9] ... at a price to be mutually agreed upon." Because the Supreme Court has instructed that federal statutes concerning Indian tribes must be construed "liberally in favor of the Indians," Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985), we assume for purposes of this opinion that this provision in the second Settlement Agreement entailed a "service" within the meaning of § 81, see Green v. Menominee Tribe, 233 U.S. 558, 569, 34 S.Ct. 706, 710, 58 L.Ed. 1093 (1914) (finding § 81 applicable to sales contract); see also Wisconsin Winnebago Bus. Comm. v. Koberstein, 762 F.2d 613, 619 (7th Cir.1985) (applying § 81 to management contract); United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enterprise Management Consultants, Inc., 734 F.Supp. 455, 457 (W.D.Okla.1990) (same), aff'd in part and rev'd in part, 968 F.2d 22 (10th Cir.1992); but see United States ex rel. Harlan v. Bacon, 21 F.3d 209, 211 (8th Cir.1994) (determining that lease agreement which provided that forty percent of produce deriving from use of leased land be delivered to tribe did not entail service within meaning of § 81).
 
 
 34
 c. Relative to Indian lands
 
 
 35
 The final prong of the § 81 analysis, whether the Settlement Agreements were "relative to [Indian] lands," presents a more difficult question. The first Settlement Agreement is not relative to Indian lands because it neither pertained nor referred to any land whatsoever. The second Settlement Agreement, however, both involved and referred to land that an Indian tribe owned. Specifically, the second Settlement Agreement provided for the disposition of the Holden Lot. At first glance, § 81 may appear to apply to the Holden Lot because PIN, an Indian tribe, owned this parcel of land. We believe, however, that the meaning of § 81's language, the intentions of its drafters, the Interior Secretary's interpretation of § 81, the case law from other circuits that have interpreted the statute, the dictates of common sense, and the federal policy promoting tribal self-determination support a holding that the statute does not apply to the Holden Lot. Although we have uncovered no precedent that explicitly considers whether or not § 81 applies to land that an Indian tribe purchased in fee simple for investment purposes, in doing so now we give voice to an assumption underlying virtually every decision addressing the applicability of § 81 to service agreements with Indian tribes relative to their lands.
 
 
 36
 We base our conclusion primarily on the distinctions between Indian trust or tribal lands (hereinafter "Indian trust lands")[10] and lands that Indian tribes hold in fee simple (hereinafter "Indian fee lands"). The phrase "Indian trust lands" derives from the historic trust relationship existing between Indian tribes and the federal government, originally described as "resembl[ing] that of a ward to his guardian." Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831); see also Oneida County v. Oneida Indian Nation, 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985); United States v. Sam Pelican, 232 U.S. 442, 447, 34 S.Ct. 396, 398, 58 L.Ed. 676 (1914); Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370, 379 (1st Cir.1975). Indian trust lands constitute real property the title to which the United States holds in trust for an Indian tribe. See 25 U.S.C. § 465; Felix S. Cohen's Handbook of Federal Indian Law 476 (Rennard Strickland et al. eds., 1982) [hereinafter Cohen's Handbook ].
 
 
 37
 Fee simple lands, by contrast, are those lands in which the owner "is entitled to the entire property, with unconditional power of disposition." Black's Law Dictionary 615 (6th ed.1990). Federal law recognizes that Indian tribes may hold certain lands in fee simple and that these lands may not be subject to the trust relationship between Indian tribes and the federal government. See, e.g., 25 U.S.C. § 1466. Specifically, and pertinent to these appeals, the Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721-1735, indicates that the Holden Lot constitutes Indian fee land over which the federal government does not have a trust responsibility because the Lot does not lie within designated PIN Territory. In fact, Congress expressly disavowed trust responsibility for Indian real property encompassing the area in which the Holden Lot is situated.[11] Accordingly, we find that PIN held the Holden Lot in fee simple. We now consider the impact this fact has on whether § 81 applies to the second Settlement Agreement.
 
 
 38
 This inquiry necessitates that we first consider the statute's text. See United States v. Gonzales, --- U.S. ----, ----, 117 S.Ct. 1032, 1034, 137 L.Ed.2d 132 (1997). As previously noted, § 81 states: "No agreement shall be made by any person with any tribe of Indians ... for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands...." The statute does not distinguish between Indian trust lands and Indian fee lands; nor does it refer to all Indian lands. In fact, § 81's scope is not clearly defined. See Mark A. Jarboe, Fundamental Legal Principles Affecting Business Transactions in Indian Country, 17 Harmline L.Rev. 417, 430 (1994); see also Stowell v. Secretary of Health and Human Servs., 3 F.3d 539, 542 (1st Cir.1993) ("Given two plausible alternatives, and recognizing that the universe of interpretive possibilities may extend beyond them, we think the statute contains an undeniable ambiguity.").
 
 
 39
 Section 81's lack of clarity and its failure to define the phrase "Indian lands" requires us to determine the "ordinary or natural" meaning of these terms. See Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 2053-54, 124 L.Ed.2d 138 (1993). When Congress has failed to define statutory language, the Supreme Court has resorted to authoritative texts to determine the ordinary meaning of statutory language. See id. at 229, 113 S.Ct. at 2054. According to one such text, the term "Indian lands" refers to "[r]eal property ceded to the U.S. by Indians, commonly to be held in trust for Indians." Black's Law Dictionary 771 (6th ed.1990). The definition of Indian tribal or trust land is virtually identical: "real property the title to which is vested in [the] United States but held in trust for the Indians." Id. at 772.[12]
 
 
 40
 In the context of § 81, the phrase "relative to [Indian] lands" is understood to refer to Indian trust lands. See Cohen's Handbook at 318 n. 293 (explaining that "25 U.S.C. § 81[ ] prohibit[s] contracts with Indian tribes concerning trust property unless approved by the Commissioner of Indian affairs") (emphasis added); Patrick K. Duffy and Lois A. Lofgren, Jurassic Farce: A Critical Analysis of the Government's Seizure of "Sue," A Sixty-Five-Million-Year-Old Tyrannosaurs Rex Fossil, 39 S.D.L.Rev. 478, 528 n. 169 (1994) (indicating that pursuant to § 81, the Secretary "has oversight responsibility for approving or vetoing the terms and conditions of all contracts involving Native American tribal or trust property ") (emphasis added). No authority directly states that § 81 applies to Indian fee lands. It is understood, however, that by adopting § 81 "Congress prohibited most contracts between non-Indians and tribes ... unless approved by the Secretary of the Interior and the Commissioner of Indian Affairs." Cohen's Handbook at 143. Thus, although it appears that § 81's "relative to [Indian] lands" language connotes Indian trust lands rather than Indian fee lands, we acknowledge that this interpretation is not iron-clad.
 
 
 41
 Recognizing that we cannot end our inquiry with the "ordinary" or "natural" meaning of the statute's terms, we consider the relevant legislative history in an effort to give effect to the intentions of the statute's drafters. See Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982); United States ex rel. S. Prawer & Co. v. Fleet Bank, 24 F.3d 320, 327 (1st Cir.1994); Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 769 F.2d 13, 17 (1st Cir.1985), aff'd, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). This inquiry is particularly appropriate in the context of federal Indian law. The Supreme Court has made it clear that "Indian law[ ] cannot be interpreted in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted [such law]." Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 206, 98 S.Ct. 1011, 1020, 55 L.Ed.2d 209 (1978); see also Central Machinery Co. v. Arizona State Tax Comm'n, 448 U.S. 160, 166, 100 S.Ct. 2592, 2596, 65 L.Ed.2d 684 (1980) (explaining that courts must "interpret [certain federal statutes involving Indian tribes] ... in light of the Congress that enacted them").
 
 
 42
 Congress "intended [§ 81] to protect the Indians from improvident and unconscionable contracts." In re Sanborn, 148 U.S. 222, 227, 13 S.Ct. 577, 579, 37 L.Ed. 429 (1893); see also Cong. Globe, 41st Cong., 3d Sess. 1483, 1483 (daily ed. Feb. 22, 1871) (declaring that statute was for Indians' "protection and to prevent them from being plundered") (comments of Senator Davis). Specifically, Congress adopted § 81 to protect Indian tribes and individual Indians from persons, particularly attorneys and claims agents, offering dubious services, typically the assertion of the Indians' land claims against the government, in exchange for enormous fees. See Cong. Globe, 41st Cong. at 1483-86. One senator indicated that this section "would prevent ... contracts being made by [Indian tribes] unless approved by the Secretary of the Interior in any matter relating to the land or annuities that they hold under or derive from the United States." See Cong. Globe, 41st Cong. at 1486 (comments of Senator Harlan) (emphasis added). Another senator declared that § 81 "is limited to such agreements or services as are made or rendered relative to the lands of the Indians or to any claim against annuities from or treaties with the United States." Id. (comments of Senator Casserly) (emphasis added).
 
 
 43
 Evidence of the drafters' assumptions and intentions does little to resolve whether or not the phrase "relative to [Indian] lands" pertains to both Indian trust land and Indian fee lands, or solely to the former. The two statements addressing the application of § 81 may be read differently: Senator Harlan's description may indicate that the statute applies solely to lands over which the federal government exercises a trust responsibility; Senator Casserly's explanation may mean that the statute applies to Indian lands generally. To reconcile this ambiguity, and thus to parse the ordinary meaning of § 81 at the time of its ratification, we consider the understanding of the status of Indian lands that prevailed at the time Congress passed § 81.[13] See Oliphant, 435 U.S. at 206, 98 S.Ct. at 1019-20.
 
 
 44
 In 1872, when Congress passed § 81, federal law provided that Indian tribes enjoyed the right to possess and occupy lands but not to alienate these lands without the federal government's approval. See Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543, 574, 5 L.Ed. 681 (1823) (indicating that United States possessed title to all Indian lands "subject only to the Indian right of occupancy"); United States v. Cook, 86 U.S. (19 Wall.) 591, 592-94, 22 L.Ed. 210 (1873) (explaining that Indians enjoyed only right of occupancy in Indian lands and that "the fee was in the United States"); David H. Getches and Charles F. Wilkinson, Federal Indian Law 161 (1986) ("The United States had the exclusive right to purchase or extinguish Indian title.") [hereinafter Federal Indian Law ]. Memorializing this conception of Indian real property rights, Congress adopted general, comprehensive legislation addressing the rights of Indian tribes with respect to their lands during this era. See, e.g., Nonintercourse Act of 1834, R.S. § 2116 (codified as 25 U.S.C. § 177) (prohibiting "purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians") (emphasis added).[14] Congress did not distinguish between Indian trust lands and Indian fee lands at this time presumably because it did not contemplate that Indian tribes could hold land in fee simple.
 
 
 45
 During this time, however, Congress did provide for individual Indians to hold land in fee simple. See 25 U.S.C. §§ 348-349 (1887). The allotment process that these statutes authorized permitted the Secretary to transfer certain real property to individual Indians. Typically, the United States would hold such lands in trust for the designated individuals for a period of twenty-five years. See Sam Pelican, 232 U.S. at 447, 34 S.Ct. at 398. The Secretary, at his discretion, could "cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed." 25 U.S.C. § 349. Despite these statutes' provision for individual Indians' fee simple ownership of real property, we have unearthed no legislation enacted during this time that afforded similar rights to Indian tribes. See Cohen's Handbook at 36 & n. 78.
 
 
 46
 Interpreting § 81 and its legislative history in light of the understandings and assumptions of those who drafted it, see Oliphant, 435 U.S. at 206, 98 S.Ct. at 1019-20, thus supports the conclusion that § 81 does not pertain to the Holden Lot. When Congress passed § 81 it did not envision that Indian tribes could hold land in the manner that PIN held the Holden Lot. Cf. Cohen's Handbook at 127-43 (concluding that during this time "extensive government supervisory power over the everyday life of Indians was essentially unchecked"). It therefore would seem anomalous, in endeavoring to give effect to Congress' intent, to apply § 81 to lands PIN purchased in fee simple for investment purposes.
 
 
 47
 Admittedly, the broad remedial purposes that § 81's drafters attributed to the statute may complicate this analysis. Congress desired to protect Indian tribes from unscrupulous business practices, see Cong. Globe 41st Cong. at 1485-86, and enjoyed the sole right to encumber all Indian lands, see Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 667, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974) ("Once the United States was organized and the Constitution adopted ... tribal rights to Indian lands became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States."). It may seem plausible, therefore, that § 81 should apply to agreements for services relative to all Indian lands. Congress, moreover, occasionally did authorize individual Indians to hold designated parcels of real property in fee simple, and, therefore, could have exempted these fee simple lands from § 81's purview if it did not want § 81 to apply to Indian fee lands. To our knowledge, Congress has adopted no such exemption. Our analysis thus illustrates that although § 81's legislative history, considered in light of the status of federal Indian law during the middle of the nineteenth century, points to the conclusion that § 81 does not apply to Indian fee lands, it does not provide a clear answer to the issue we face today.
 
 
 48
 Having failed to arrive at a definitive answer to our inquiry through reference to § 81's plain meaning and legislative history, we turn to analyze the interpretation of the agency responsible for administering the statute. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). Although we have not unearthed a general interpretation of § 81 advanced by the Secretary of the Interior, in this case the parties submitted the Partnership Agreement for the Secretary's approval. The Area Director of the Eastern Area Office of the Bureau of Indian Affairs[15] stated:
 
 
 49
 The Secretary has determined that the Agreement does not encumber trust land or other trust assets, that the Agreement is not subject to the provisions of 25 U.S.C. § 81 (1982), and that, as a result, the Nation has contractual capacity to enter into this Agreement without additional Secretarial approval.
 
 
 50
 Declaration of B.D. Ott, Area Director, Eastern Area Office, Bureau of Indian Affairs (December 31, 1986).
 
 
 51
 This declaration illustrates that in determining whether or not an agreement with an Indian tribe falls within the parameters of § 81, the Secretary focuses on whether or not the agreement relates to Indian trust lands or assets. See also Barona Group of the Capitan Grande Band of Mission Indians v. American Management & Amusement, Inc., 840 F.2d 1394, 1404-05 (9th Cir.1987) (quoting Acting Superintendent for Southern California Bureau of Indian Affairs office explaining that § 81 does not apply if "trust lands and funds are not involved"). In this case, the second Settlement Agreement did not involve Indian trust lands or assets. Although the administrative agency's interpretation does not function to conclusively resolve our evaluation of whether § 81 pertains to the second Settlement Agreement, see Stowell, 3 F.3d at 544; American Management, 840 F.2d at 1405, we must afford it considerable deference, see Chevron U.S.A., 467 U.S. at 843, 104 S.Ct. at 2781-82; Strickland v. Commissioner, Maine Dep't of Human Servs., 96 F.3d 542, 547 (1st Cir.1996).
 
 
 52
 Judicial interpretation of § 81 provides further guidance. See Securities Indus. Ass'n v. Board of Governors of Fed. Reserve Sys., 839 F.2d 47, 49 (2d Cir.1988) (explaining that in determining reasonableness of administrative agency's interpretation of statute, court should consider judicial construction). Courts generally have focused on the existence of Indian trust land in evaluating § 81's "relative to [Indian] lands" component. In Koberstein, 762 F.2d at 619, the Seventh Circuit explicitly stated that § 81 applied to a bingo management agreement because " § 81 applies to Indian land transactions concerning their tribal trust property." (emphasis added). See also Pueblo of Santa Ana, 663 F.Supp. at 1306 (finding § 81 applicable to agreement because it provided for construction and operation of facility on "tribal trust property ") (emphasis added); Enterprise Management, 734 F.Supp. at 457 (voiding bingo management agreement providing non-Indian party exclusive right to operate bingo games on Indian trust lands because this agreement was "relative to Indian lands and ... thus governed by section 81").
 
 
 53
 The Ninth Circuit in particular has manifested the importance that the presence of Indian trust lands plays in the "relative to [Indian] lands" analysis. In A.K. Management Co. v. San Manuel Band of Mission Indians, 789 F.2d 785, 786 (9th Cir.1986), the Ninth Circuit considered the applicability of § 81 to a bingo management contract that the San Manuel Band of Mission Indians executed with a bingo management company. Upholding the district court's grant of summary judgment, the court held "that the instant Agreement is 'relative to [Indian] lands' under 25 U.S.C. § 81." Id. at 787. In reaching this conclusion, the court reasoned that "the Agreement gives the non-Indian contracting party ... the express right to build and control the operation of the bingo facility located on tribal trust lands and prohibits the Band from encumbering the land." Id. (emphasis added).
 
 
 54
 One year later, in American Management, 840 F.2d at 1404, the Ninth Circuit again determined that a contract between an Indian tribe and a non-Indian bingo management company providing for the construction and operation of a bingo facility on Indian trust lands was " 'relative to [Indian] lands' under section 81." The court specifically stated that it reached this conclusion despite the fact that the agreement neither afforded the non-Indian party exclusive control over the bingo facility nor abridged the tribe's ability to encumber its trust lands. See id. The fact that the non-Indian party exercised some control over Indian trust lands, however minimal, proved decisive to the American Management court's analysis. See id.; see also United States ex rel. Yellowtail v. Little Horn State Bank, 828 F.Supp. 780, 787 (D.Mont.1992) ("The only interest the government has in overseeing certain contracts and agreements with Indians flows from its duty as trustee of tribal resources.... The nature of the government's interest is in the Tribe's trust resources 'relative to the land.' "), aff'd, 15 F.3d 1095 (9th Cir.1994).
 
 
 55
 The most recent circuit court decision to specifically address the "relative to [Indian] lands" component of § 81, Altheimer & Gray, 983 F.2d at 808-12, offers a slightly different construct that further supports the conclusion that the second Settlement Agreement in this case is not "relative to [Indian] lands." The Altheimer court considered a Letter of Intent that a federally recognized Indian tribe, in the form of a wholly owned tribal corporation, executed with an Illinois corporation providing for the manufacture of latex medical products on tribal trust lands. See id. at 806-07. Although manufacture of the products actually commenced, the parties failed to execute the necessary contracts. Operations thus ceased shortly after commencement. The Illinois corporation sued the tribal corporation for breach of contract. The district court found the Letter of Intent void pursuant to § 81 and granted summary judgment to the tribal corporation. See id. at 806-07.
 
 
 56
 The Seventh Circuit reversed the district court. See id. at 815. In so doing, the court set forth four factors that it considered determinative of whether or not a management contract is "relative to [Indian] lands" pursuant to § 81:
 
 
 57
 1) Does the contract relate to the management of a facility to be located on Indian lands?
 
 
 58
 2) If so, does the non-Indian party have the exclusive right to operate that facility?
 
 
 59
 3) Are the Indians forbidden from encumbering the property?
 
 
 60
 4) Does the operation of the facility depend on the legal status of an Indian tribe being a separate sovereign?
 
 
 61
 Id. at 811. Despite the fact that the Letter of Intent involved the operation of a facility on Indian trust lands, the Altheimer court found that it was not relative to Indian lands and thus not within the purview of § 81. The Seventh Circuit emphasized the fact that the non-Indian contracting party did not have exclusive control of the facility and that "the business derived no special benefit from its location on Reservation land." Id. at 812.
 
 
 62
 Considering the present case in light of Altheimer compels two initial observations. First, the second Settlement Agreement obviously did not constitute a management contract. Second, importing the precise considerations pertinent to an evaluation of a management contract to an analysis of an agreement to assist in locating a purchaser for land may present certain difficulties. See id. at 811 (indicating that the four factors that it set forth "are not the 'sine qua non ' of a contract which relates to Indian lands").
 
 
 63
 Despite its distinguishing characteristics, however, Altheimer informs our analysis of PIN's appeal. Specifically, the Altheimer court refused to find the agreement "relative to [Indian] lands" in part because the Indian tribe in Altheimer remained involved in the business relationship. In this case, PIN participated in the Partnership, not through daily management duties, but through financing and leasing activities promoting Schiavi Homes' business activities. More importantly, Altheimer emphasized the fact that the subject matter of the contract derived no special benefit from the Indian tribe's sovereign status. See id. at 812. The Altheimer court explained: "Unlike bingo, manufacturers of latex medical products need not seek refuge from state civil laws by locating on a reservation." Id. In this case, the parties to the second Settlement Agreement derived no special benefit from PIN's sovereign status.[16]
 
 
 64
 Notwithstanding the fact that Altheimer, like the other cases we have considered, supports the conclusion that the second Settlement Agreement does not fall within the purview of § 81, we consider one additional case in which the district court for the district of Rhode Island interpreted § 81's "relative to [Indian] lands" requirement. See Narragansett Indian Tribe v. RIBO, Inc., 686 F.Supp. 48, 51 (D.R.I.1988), aff'd on other grounds, 868 F.2d 5 (1st Cir.1989). The Narragansett court considered § 81's applicability to two management agreements "contemplating acquisition by the Tribe of property on which a high stakes bingo hall could be constructed." See id. at 49. Following execution of the agreements, the Tribe purchased a total of 28.8 acres of land adjacent to the Tribe's reservation. See id. at 50. The Tribe, however, failed to secure trust status for this land. See id.
 
 
 65
 The Narragansett defendants specifically argued that " § 81 pertained only to 'tribal land' ... [that is,] land that is part of the Tribe's reservation." Id. The district court rejected this argument, reasoning:
 
 
 66
 [S]uch a construction proves to be at variance with both the plain language of the statute and with its broad remedial purpose. Thus the statute uses the term 'their [the Indians'] lands' without differentiating between original tribal lands and those subsequently acquired. Reading into those words the limitation urged by Defendants would distort their plain meaning. Moreover, it also would emasculate the statute and frustrate its purpose of providing a mechanism to regulate Indian land transactions.
 
 
 67
 Id. Although the Narragansett court recognized that § 81 "has its origin in the longstanding trust relationship between the federal government and Indian tribes," id. at 50, it held that " § 81 renders both the agreements and the notes and mortgages given by the Tribe in accordance with their terms null and void." Id. at 51.
 
 
 68
 We find the Narragansett court's reasoning unpersuasive. The construction that the Narragansett defendants advanced, we believe, comports with the plain language of the statute. If § 81 is predicated on the trust relationship between the federal government and the Indian tribes, see id.; United States ex rel. Hall v. Tribal Dev. Corp., 49 F.3d 1208, 1214 (7th Cir.1995), then reading § 81 to apply to Indian lands purchased in fee simple for business reasons contradicts the statute's purpose and its drafters' intentions. Even those courts that have propounded a broad reading of § 81's "relative to [Indian] lands" component, moreover, have not found that this phrase refers to Indian fee lands. See, e.g., Koberstein, 762 F.2d at 619; United States ex rel Shakopee v. Pan American Mgmt. Co., 616 F.Supp. 1200, 1217-18 (D.Minn.1985) (finding that "the management agreements [were] ... inextricably tied up in the property rights flowing from the establishment of the bingo operations on tribal trust lands ") (emphasis added). We thus find that to the extent Narragansett can be read to hold that Indian fee lands purchased for investment purposes and not designated as trust lands qualify as "Indian lands" under § 81, that holding is not compelling.[17]
 
 
 69
 To reach a different conclusion in the context of the Holden Lot would defy common sense. See United States v. Carroll, 105 F.3d 740, 744 (1st Cir.1997) (instructing that common sense construction that "avoid[s] absurd or counter-intuitive results" is favored); O'Connell v. Shalala, 79 F.3d 170, 176 (1st Cir.1996) (explaining that "courts are bound to afford statutes a practical, common-sense reading"). Were we to hold that the second Settlement Agreement required the Secretary's approval pursuant to § 81 despite the fact that it relates only to Indian fee lands purchased for business reasons, we would force the Secretary to exercise a trust responsibility with respect to lands over which Congress specifically disavowed any further trust obligation.[18] See 25 U.S.C. § 1724(d)(3); 25 U.S.C. 1722(j); Me.Rev.Stat. Ann. tit. 30, § 6205(2)(B) (1993).
 
 
 70
 In the Maine Indian Claims Settlement Act, Congress not only disavowed further trust responsibility over the area encompassing the Holden Lot, it expressly stated that the Nonintercourse Act, 25 U.S.C. § 177, no longer applied to PIN. See 25 U.S.C. § 1724(g)(1). This is significant because we previously have indicated that "the 'trust relationship' ... has as its source the Nonintercourse Act, meaning that the trust relationship pertains to land transactions which are or may be covered by the Act." Passamaquoddy Tribe, 528 F.2d at 379. Because the Nonintercourse Act no longer pertains to PIN, Passamaquoddy Tribe dictates that the federal government does not have a trust obligation with respect to the Holden Lot. See also 25 U.S.C. § 1724(d)(3).[19] Imposing such a responsibility pursuant to § 81 would defy not only common sense but logic as well.[20] See Lummi Indian Tribe v. Whatcom County, 5 F.3d 1355, 1359 (9th Cir.1993) (ruling that Nonintercourse Act did not apply to land Indian tribe purchased in fee simple over which Congress previously terminated its trust obligation); cf. Federal Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 110-15, 80 S.Ct. 543, 550-53, 4 L.Ed.2d 584 (1960) (finding that federal government did not own an interest in lands Indian tribe purchased in fee simple).
 
 
 71
 Applying § 81 to the Holden Lot also would necessitate that almost every agreement for services executed with an Indian tribe, no matter how minute, would require Secretarial approval. See In re United States ex rel. Hall, 825 F.Supp. 1422, 1434 (D.Minn.1993) (discussing undesirable implications of such an interpretation), aff'd, 27 F.3d 572 (8th Cir.1994), cert. denied, 513 U.S. 1155, 115 S.Ct. 1112, 130 L.Ed.2d 1076 (1995); see also Raymond Cross, De-Federalizing American Indian Commerce: Toward a New Political Economy for Indian Country, 16 Harv. J.L. & Pub. Pol'y 445, 489 (1993) (indicating that even as presently interpreted, "[e]xperience has shown ... that in many cases ... [§ 81] harms, rather than helps, Indian tribes. Its rigid formalism and over-inclusiveness chill business dealings between tribes and third parties without providing substantial offsetting benefits."). We believe that further extending administrative authority over the Holden Lot would neither favor, see Montana v. Blackfeet Tribe, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985), nor protect, see In re Sanborn, 148 U.S. at 227, 13 S.Ct. at 579-80, Indian tribes. In fact, adopting PIN's interpretation would frustrate Indian tribes' efforts to promote economic development and fiscal autonomy.
 
 
 72
 This analysis reflects the modern trend in federal Indian policy away from outmoded paternalistic[21] practices and policies. See Cohen's Handbook at 180-206; Federal Indian Law at 151-59. Particularly during the last forty years, Congress has endeavored to afford Indian tribes the latitude to pursue their social, political, and economic goals as they determine appropriate. See, e.g., 25 U.S.C. § 450 (proclaiming that "prolonged Federal domination ... has served to retard rather than enhance the progress of Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self government"); 25 U.S.C. § 450a (declaring Congress' commitment to "the establishment of a meaningful Indian self-determination policy"); Blatchford v. Native Village of Noatak, 501 U.S. 775, 793, 111 S.Ct. 2578, 2588, 115 L.Ed.2d 686 (1991) (Blackmun, J., dissenting) (noting that Congress has passed legislation in recent decades "as part of a larger national policy of 'self-determination' for the Native American peoples"). To find § 81 applicable to a tract of real property that PIN purchased in fee simple to promote its business interests would contravene modern efforts to secure tribal self-determination.
 
 
 73
 In light of these policy considerations, the dictates of common sense, the vast majority of § 81 jurisprudence, and the Secretary's interpretation, we conclude that the second Settlement Agreement does not qualify as "relative to [Indian] lands." This Agreement did not pertain to Indian trust lands. In fact, the second Settlement Agreement involved lands PIN purchased in fee simple to promote its investment objectives over which Congress expressly disavowed trust responsibility. To rule that this Agreement necessitated the Secretary's approval pursuant to § 81, we conclude, would strain the statute's ordinary meaning and exceed its drafters' intentions.
 
 
 74
 We recognize that statutes affecting Indian tribes must be construed liberally in favor of the tribes. See Blackfeet Tribe, 471 U.S. at 766, 105 S.Ct. at 2403. The rule recited in Blackfeet Tribe, however, does not require a court to ignore compelling authority supporting a conclusion contrary to the position that a particular Indian tribe advances. See Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 456, 108 S.Ct. 1319, 1329, 99 L.Ed.2d 534 (1988). We therefore hold that the Settlement Agreements did not fall within the parameters of § 81, and thus that the two Settlement Agreements constituted valid, binding releases that preclude PIN from further pursuing its remaining claims.
 
 2. Underlying Agreements
 
 75
 Despite the fact that § 81 does not apply to the Settlement Agreements, and thus that the Settlement Agreements function to release PIN's remaining claims, we must briefly consider whether § 81 applies to the underlying agreements at issue in this case. We pursue this inquiry to deter potential abuse stemming from the execution of a settlement agreement in the context of § 81. We are particularly concerned that parties to an agreement for services relative to Indian trust lands may seek to avoid securing Secretarial approval of such agreement pursuant to § 81 by executing a release of all claims arising out of such transaction. Theoretically, one party could then assert that this release did not constitute an agreement with an Indian tribe for services relative to Indian lands, and that the release functions to prohibit any action that a party to the release initiates subsequently to void the underlying agreement pursuant to § 81.[22] To avoid creating a potential safe harbor, we evaluate the three underlying agreements at issue in this case to determine whether or not they necessitated the Secretary's approval pursuant to § 81.
 
 
 76
 a. Asset Purchase Agreement
 
 
 77
 The Asset Purchase Agreement[23] constituted the operative agreement relating to the Partnership's purchase of SHC. This Agreement was a pure sales contract. Without regard to whether § 81's "services" component pertains to sales contracts, see Menominee Tribe, 233 U.S. at 570-71, 34 S.Ct. at 710-11 (finding § 81 applicable to contract for sale of logging equipment and supplies); but see Hall, 825 F.Supp. at 1431-32 (ruling that "Congress did not intend that section 81 govern sales contracts"), the only real property that the Agreement mentioned was real property that the seller, SHC, possessed, not land that an Indian tribe, specifically PIN, owned. This Agreement simply stipulated that the Partnership secured a $3.5 million guaranteed loan from Key Bank; it neither required nor referred to PIN's use of its land as collateral for this loan.
 
 
 78
 b. Partnership Agreement
 
 
 79
 We find that the Partnership Agreement did constitute a services agreement because it contained a provision dictating that Palmer enjoyed sole responsibility for managing SHC to the benefit of both Palmer and PIN. See Koberstein, 762 F.2d at 619 (finding that § 81 governs management contracts). Nonetheless, despite PIN's assertion that the parties envisioned the use of PIN's lands to advance SHC's business activities, the Partnership Agreement neither specifically mentioned nor indirectly referenced any use of land. It merely stated that PIN would provide a $1 million Letter of Credit to secure Key Bank's Guaranteed Loan financing the purchase of SHC. The Partnership Agreement, therefore, does not fall within the parameters of § 81 because it does not constitute an agreement for services relative to Indian lands.[24]
 
 
 80
 Because the service that the Partnership Agreement provided for entailed the management of SHC, we briefly evaluate this Agreement in light of Altheimer, which addressed the applicability of § 81 to a management agreement. See 983 F.2d at 811. The relevant Altheimer factors indicate that the Partnership Agreement does not fall within § 81's purview. Specifically, the Partnership Agreement did not relate to the management of a facility to be located on Indian lands, and, even if it did, the operation of such facility would not have depended in any way on PIN's legal status as a separate sovereign. See id.
 
 
 81
 c. Lease-Option Agreement
 
 
 82
 The Lease-Option Agreement, unlike the Partnership Agreement, did not pertain to "services" relative to Indian lands.[25] The Lease-Option simply provided that Schiavi Homes enjoyed the right to use and improve the Holden Lot for the purpose of conducting its business. It also afforded Schiavi Homes an option to purchase the Holden Lot. The Lease-Option never mentioned and did not relate to the provision of services. In addition, although it did involve real property that PIN owned (the Holden Lot), as previously noted this land was not within the parameters of § 81 because it was not trust land. Even if the Holden Lot did constitute Indian trust lands, § 81 would not apply to the Lease-Option Agreement because the Maine Indian Claims Settlement Act provided that 25 U.S.C. §§ 396 & 415 would govern leases involving PIN territory. See 25 U.S.C. § 1724(g)(3)(A) & (B) (providing that 25 U.S.C. §§ 396a-396g & 415-415d govern leasing of PIN Territory); see also Koberstein, 762 F.2d at 619 (indicating that § 81 governs transactions relative to Indian lands for which Congress has not passed a specific statute).
 
 B. Breach of Contract
 
 83
 Palmer and Palmer Management assert that by filing the instant suit, PIN breached the contractual obligation memorialized in the Settlement Agreements to "release all claims." In their counterclaim, these two cross-Appellants sought damages from this purported breach deriving from the "loss of time that could otherwise be spent in the pursuit of legitimate business interests." On appeal, Palmer and Palmer Management request damages "caused by the lawsuit outside of attorney fees."[26] Because we find the Settlement Agreements to constitute valid releases not within the parameters of § 81, we now consider Palmer and Palmer Management's breach of contract counterclaims.
 
 
 84
 Both Settlement Agreements state: "The parties hereto have been collectively negotiating a final settlement in the Schiavi Homes loan transaction, termination of business and liquidation, and are desirous of reaching a final settlement between the parties to avoid litigation now in existence or that could hereafter arise." As mentioned earlier, both Settlement Agreements expressly provided that the parties "release, remise and forever discharge each other ... from all suits ... at law or in equity ... which directly or indirectly relate[ ] to ... any ... transactions ... among each other." The district court dismissed Palmer and Palmer Management's claim for lost business damages on the grounds that PIN's lawsuit in violation of the Settlement Agreements "was seemingly in good faith" and "was not frivolous." Penobscot Indian Nation v. Key Bank, Civ. No. 94-0212-B, at 6 (D.Me. Dec. 13, 1995).
 
 
 85
 "A compromise agreement, fairly arrived at, is an enforceable contract both under Maine law and general doctrine."[27] Warner v. Rossignol, 513 F.2d 678, 682 (1st Cir.1975); see also Phillips v. Fuller, 541 A.2d 629, 629 n. 1 (Me.1988) (recognizing that claim can be asserted for a breach of a settlement agreement, and, specifically, that such a claim can take the form of a counterclaim); A.L. Brown Constr. Co., Inc. v. McGuire, 495 A.2d 794, 798 (Me.1985) (finding settlement agreement to be an enforceable contract). Whether or not an enforceable contract is breached does not turn on whether or not the breaching party acted in good faith. Cf. John D. Calamari & Joseph M. Perillo, The Law of Contracts 455 (2d ed. 1977) ("Any failure to perform a contractual duty which has become absolute constitutes a breach."); E. Allan Farnsworth, Contracts 636 (1982) ("[T]o abandon the traditional view and take account of good faith in all cases would probably be unworkable.").
 
 
 86
 The issue which demands our full attention, therefore, concerns the nature of the damages that Palmer and Palmer Management may receive as a result of PIN's breach of the Settlement Agreements. Palmer and Palmer Management contend that Dodge v. United Services Auto. Ass'n, 417 A.2d 969, 975 (Me.1980) supports their claim for damages other than attorney's fees. In Dodge, the parties entered into a settlement agreement concerning a homeowners insurance policy. The agreement included a provision releasing all claims stemming from the insurance policy. Subsequent to the execution of the agreement, plaintiff filed suit against the insurance company. The insurance company then responded with "a counterclaim for specific performance of the settlement agreement and for damages resulting from [plaintiff's] ... breach thereof," id. at 972, which "consisted principally of its attorney's fees incurred in defending the suit brought by [the plaintiff] ... in violation of the settlement agreement," id. at 975. The Superior Court did not order specific performance because it found that "effectively the same result had already been accomplished by the court's disposition of the main claims asserted by [the plaintiff]." Id. at 975. The Superior Court also denied the insurance company's claim for attorney's fees. See id.
 
 
 87
 The insurance company cross-appealed these rulings, recognizing that if the Maine Supreme Court affirmed the Superior Court's judgment, there would be no need to reach the issue of specific performance. The Dodge court held:
 
 
 88
 Because of the pervasiveness and vigor of the American rule making each party bear its own attorney's fees, parties to a settlement--in absence of an express contractual provision to the contrary--must be taken to intend to exclude attorney's fees from the damages that otherwise would be recoverable as a foreseeable and probable consequence of a breach of the agreement.
 
 
 89
 Id. The Maine Supreme Court explained in detail its denial of damages which normally attend a breach of contract in the case of the breach of a settlement agreement:
 
 
 90
 An after-the fact rationalization for the rule denying normal contract damages for breach of settlement agreements can also be developed from the strong public policy favoring such settlements. Were the rule otherwise, a lawyer would be much more wary of informal settlement discussions for fear of subjecting his client to the added expense of the opposing party's attorney's fees if it were later determined that those discussions had in fact reached the point of a binding bilateral agreement. On balance it may be preferable to encourage free settlement negotiations, undampened by the risk of the heavy damages that would be assessed in those relatively few cases where one party fails to perform its agreement.
 
 
 91
 Id. at 976. The Dodge court thus denied the insurance company's cross-appeal in full.
 
 
 92
 Although it may be debatable whether Dodge resolved the issue concerning the possibility of a non-breaching party recovering on a breach of contract theory the costs of litigation, other than attorney's fees, resulting from its defense of a suit filed in contravention of a settlement agreement, we need not take up this debate today. Palmer and Palmer Management have not directed us to any Maine case that grants damages of the variety that they seek, and we have not found any such case on our own initiative. We note that Maine does recognize the remedy of specific performance in the event of a breach of a settlement agreement. See McGuire, 495 A.2d at 798 (indicating that party may seek specific performance as remedy for breach of settlement agreement). By ruling that § 81 does not apply to the Settlement Agreements in this case, and thus that these Agreements preclude PIN's remaining claims, we effectively have provided Palmer and Palmer Management the equitable remedy of specific performance of the Settlement Agreements.
 
 
 93
 We need not sift alternative sources of authority to resolve the exact issue of whether or not the law affords damages in addition to specific performance in the event of a breach of a settlement agreement[28] because no material issue of fact exists as to the damages that Palmer and Palmer Management sustained as a result of PIN's breach of the Settlement Agreements in this case. See Fed.R.Civ.P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."); Celotex v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) ("The moving party is 'entitled to a judgement as a matter of law' [if] ... the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."); Cortes-Irizarry v. Corporacion Insular de Seguros, 111 F.3d 184, 187 (1st Cir.1997) ("To defeat a motion for summary judgment, the nonmoving party must demonstrate the existence of a trialworthy issue as to some material fact."). Palmer and Palmer Management have failed to submit any evidence of damages resulting either from "loss of time that could otherwise be spent in the pursuit of legitimate business interests," or, more generally, from "the lawsuit outside of attorney fees." We thus affirm the district court's grant of summary judgment for PIN on Palmer and Palmer Management's counterclaims for breach of the settlement agreement.
 
 C. Defamation
 
 94
 Key Bank asserts that the district court erred in granting summary judgment for Marcello on Key Bank's defamation counterclaim. The district court ruled that the press release Marcello prepared and distributed to the media concerning the two press conferences in September 1994 did not defame Key Bank.[29] See Penobscot, 906 F.Supp. at 22-23. Relying on Maine law governing a defamation claim initiated by a private person, the district court determined that Marcello was not negligent in drafting and circulating the press release to the media because he reasonably relied "on the veracity of PIN's complaint." Id. Finding that Marcello's conduct did not amount even to the negligence applicable to private persons, the district court did not consider whether or not Key Bank constituted a public figure. See id.
 
 
 95
 Key Bank insists that a genuine issue of material fact existed concerning whether or not Marcello was negligent. Key Bank also argues that the district court improperly granted summary judgment sua sponte on its defamation claims against PIN, Phillips, and Pardilla. The other cross-Appellants (Schiavi, Palmer, Palmer Development, and Palmer Management) echo Key Bank's objection to the district court's sua sponte ruling on their defamation claims against PIN. They maintain that this ruling constituted reversible error.
 
 1. Marcello
 
 96
 We first consider whether the district court properly granted summary judgment for Marcello on Key Bank's defamation claim. In order to state a claim for defamation in Maine, a private person must establish the following: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Lester v. Powers, 596 A.2d 65, 69 (Me.1991). The issue in this case is whether Marcello's conduct constituted negligence.
 
 
 97
 We find that the existence of material issues of fact precludes the entry of summary judgment concerning this issue. See Lipsett v. University of P. R., 864 F.2d 881, 885 (1st Cir.1988) ("If, after ... canvassing ... the material presented, the district court finds that some genuine factual issue remains in the case, whose resolution one way or another could affect its outcome, the court must deny the motion."). We believe that reasonable jurors could find negligence in this case. See Liberty Lobby, 477 U.S. at 248, 106 S.Ct. at 2510 (indicating that a material issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party"); see also Mejias-Quiros v. Maxxam Property Corp., 108 F.3d 425, 427 (1st Cir.1997) ("Negligence ... is usually a jury issue, but only if there exists evidence from which a rational jury could find negligence in the case at hand."); Taylor v. Gallagher, 737 F.2d 134, 137 (1st Cir.1984) ("Summary judgment is inappropriate in [cases involving] negligence ... if genuine issues of material fact exist or if reasonable jurors could draw different inferences from agreed facts.").
 
 
 98
 Reasonable jurors could draw a conclusion, at odds with the district court's finding, that Marcello did much more than "read the substance of PIN's complaint to the print and broadcast media at PIN's press conference." Penobscot, 906 F.Supp. at 23. Marcello's press release did not simply recite the complaint; it used such language as "lied to," "cheated," "manipulated," "stole[ ] from," and "conspired and acted to defraud" to describe Key Bank's conduct. Given the negligence standard in Maine of a reasonably prudent person acting under like circumstances, see Lambert v. Tripp, 560 A.2d 1097, 1100 (Me.1989); Wing v. Morse, 300 A.2d 491, 499 (Me.1973); Restatement (Second) of Torts § 283 (1978), we believe that reasonable jurors could find that Marcello's characterization of Key Bank's conduct amounted not simply to "colorful adjectives and common parlance," Penobscot, 906 F.Supp. at 23, but to negligence. See Marston v. Newavom, 629 A.2d 587, 592 (Me.1993) ("[D]efamatory language must be 'construed in the light of what might reasonably have been understood therefrom by the persons who [heard] it.' In interpreting the language, it is ... a question of ... the understanding of those to whom the words are addressed and of the natural and probable effect of the words on them.") (quoting Picard v. Brennan, 307 A.2d 833, 835 (Me.1973)).
 
 
 99
 Regardless of the reasonableness of the statements that Marcello disseminated to the media at the press conferences, a material issue of fact remains as to whether Marcello actually "rel[ied] on the veracity of PIN's complaint." Penobscot, 906 F.Supp. at 23. In his deposition testimony, Marcello stated repeatedly that he could not recollect the exact documents that he used to assemble his press package. At his deposition, in fact, Marcello could not locate the written notes or statements that he made in preparation for the press conferences. There is a material issue as to whether Marcello even consulted PIN's complaint in advance of the press conferences.
 
 
 100
 In any event, Marcello has not made a sufficient showing that he was privileged to disseminate the defamatory statements to the media. Maine law provides that "allegations made in pleadings are absolutely privileged." Dineen v. Daughan, 381 A.2d 663, 664 (Me.1978); see also Creamer v. Danks, 700 F.Supp. 1169, 1171 (D.Me.) (discussing Maine judicial proceedings pleadings privilege), aff'd, 863 F.2d 1037 (1st Cir.1988). The Maine Supreme Court has indicated that the privilege may be "lost by unnecessary or unreasonable publication beyond the scope of the privileged circumstances." Vahlsing Christina Corp. v. Stanley, 487 A.2d 264, 267 (Me.1985); see also Sriberg v. Raymond, 544 F.2d 15, 16-17 (1st Cir.1976) ("[I]f an occasion is privileged as to communications between certain parties, the privilege is lost if the communication is made in such a manner as to unnecessarily and unreasonably publish it to others, as to whom the occasion is not privileged.") (quoting Galvin v. New York, 341 Mass. 293, 168 N.E.2d 262, 266 (1960)). The Vahlsing Christina court reversed the dismissal of a defamation claim predicated on the dissemination of false statements originally contained in a complaint on the basis that publication removed the statements from the privileged context. See id.
 
 
 101
 In this case, a media relations consultant engaged by a party to a lawsuit claims protection under the judicial proceedings privilege for statements that he disseminated to the press concerning the suit. Marcello published these statements on the same day that PIN filed the complaint but prior to the commencement of any courtroom activity. "The judicial proceedings privilege reflects public policy regarding the importance and necessity of the free flow of information during such proceedings." Creamer, 700 F.Supp. at 1171. In light of the circumstances of the press conference and the public policy underlying the judicial proceedings privilege, we doubt very much that this privilege applies to Marcello's publications, which were neither reasonable nor necessary for the efficient disposition of the legal proceedings at issue. See Frazier v. Bailey, 957 F.2d 920, 932 (1st Cir.1992) (explaining that under Massachusetts law, if a communication is "unnecessarily or unreasonably published," it is no longer privileged); Dineen, 381 A.2d at 665 ("The purpose of the privilege is to allow the attorney to litigate strenuously the interests of his client. To fulfill this purpose the privilege need only be broad enough to encompass statements relevant to those interests. To extend the protection beyond this point would be to abuse the public policy which acts as the underpinnings of the privilege.").
 
 
 102
 The Maine Supreme Court has explained, moreover, that this privilege applies to judges, parties, witnesses, and attorneys. See id.; Dineen, 381 A.2d at 664-65. Marcello directs us to no authority indicating that the judicial proceedings privilege pertains to a media consultant who is not a party or a witness or an attorney in the dispute at issue.[30]
 
 
 103
 We thus conclude that Marcello's statements were not within the judicial proceedings privilege. Based on this conclusion, in addition to our findings that reasonable jurors could determine that Marcello did more than read from PIN's complaint and that a material issue of fact exists as to whether Marcello actually relied on PIN's complaint in formulating these statements, we believe that the district court improperly granted summary judgment for Marcello.
 
 
 104
 We note that if the trial court, with the assistance of further factual development, determines that Key Bank constitutes a public figure, it may resolve the defamation issue on alternative grounds. According to the Supreme Court,
 
 
 105
 it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.
 
 
 106
 Gertz v. Robert Welch, Inc., 418 U.S. 323, 345, 94 S.Ct. 2997, 3009-10, 41 L.Ed.2d 789 (1974). Although ostensibly a question of law suitable for our resolution, see Quantum Elecs. Corp. v. Consumers Union of United States, Inc., 881 F.Supp. 753, 763 (D.R.I.1995); Haworth v. Feigon, 623 A.2d 150, 158 (Me.1993); Restatement (Second) of Torts § 580A cmt. c (1978), a finding of public figure status necessitates a detailed fact-sensitive determination, see Bruno & Stillman, Inc. v. Globe Newspaper Co., 633 F.2d 583, 589 (1st Cir.1980); Quantum, 881 F.Supp. at 763; Lawrence H. Tribe, American Constitutional Law § 12-13, at 880-81 (2d ed.1988) (explaining that the determination of whether an individual constitutes a limited public figure necessitates that the trial court establish first the existence of a "public controversy," and second "that the nature and extent of the person's participation in the controversy reached some critical mass at which 'voluntary injection' occurred"). On the record before us now, we cannot make this particularized factual determination.[31]
 
 
 107
 If the trial court determines that Key Bank constitutes a public figure, Marcello may claim a conditional privilege regarding his publications concerning Key Bank. Such a privilege exists for statements concerning public figures. See Curtis Publ'g Co. v. Butts, 388 U.S. 130, 155, 87 S.Ct. 1975, 1991-92, 18 L.Ed.2d 1094 (1967). Liability does not attach for a defamatory statement concerning a public figure unless the publisher of the statement acted with knowledge or reckless disregard of the falsity of the defamatory publication. See New York Times v. Sullivan, 376 U.S. 254, 279-80, 84 S.Ct. 710, 725-26, 11 L.Ed.2d 686 (1964); Curtis Publ'g, 388 U.S. at 155, 87 S.Ct. at 1991-92; Time, Inc. v. Firestone, 424 U.S. 448, 455, 96 S.Ct. 958, 966, 47 L.Ed.2d 154 (1976); Michaud v. Inhabitants of Livermore Falls, 381 A.2d 1110, 1113 (Me.1978). On the record before us, we do not presume to direct a trial court finding regarding either the predicates for or, in the event that the trial court establishes the existence of such predicates, the consequences of a conditional privilege.
 
 2. PIN, Phillips, and Pardilla
 
 108
 We now turn to the issue of whether the district court properly granted summary judgment sua sponte for PIN, Phillips, and Pardilla. "It is [clear] that district courts have the power to grant summary judgment sua sponte." Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 29 (1st Cir.1996). Two conditions, however, circumscribe the district court's exercise of this power: first, discovery must be "sufficiently advanced that the parties have enjoyed a reasonable opportunity to glean the material facts;" second, the district court must "give[ ] the targeted party appropriate notice and a chance to present its evidence on the essential elements of the claim or defense." Id.; see also Stella v. Tewksbury, 4 F.3d 53, 55 (1st Cir.1993); Jardines Bacata, Ltd. v. Diaz-Marquez, 878 F.2d 1555, 1560 (1st Cir.1989).
 
 
 109
 In this case, discovery had proceeded to the point that the parties understood the material facts. PIN filed its complaint and conducted the press conferences in September 1994. The district court did not make its sua sponte ruling until October 1995. By this time, the parties had compiled a voluminous record that included depositions of all of the parties involved in the press conference.
 
 
 110
 As in Berkovitz, however, the district court never "gave the [cross-Appellants] a meaningful opportunity to cull the best evidence supporting [their] position[s], and to present that evidence, together with developed legal argumentation, in opposition to the entry of summary judgment" with respect PIN, Phillips, and Pardilla. Id. at 31. On the contrary, the district court's sua sponte ruling took these parties by surprise; only Marcello had moved for summary judgment and neither Schiavi nor the Palmer Defendants filed defamation claims against Marcello.[32]
 
 
 111
 We acknowledge that "[t]his court from time to time has refused to permit appellants to take advantage of supposed oversights that had not been called to the district court's attention by way of a [timely] motion to reconsider." Id. (citing United States v. Schaefer, 87 F.3d 562, 570 n. 9 (1st Cir.1996); Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir.1995); VanHaaren v. State Farm Mut. Auto. Ins. Co., 989 F.2d 1, 4-5 (1st Cir.1993)). Like the appellant in Berkovitz, however, the Palmer Defendants timely filed a motion to reconsider. Although Key Bank and Schiavi did not follow suit, the considerations that govern the filing of a motion for reconsideration are very flexible. See Berkovitz, 89 F.3d at 31; United States v. Roberts, 978 F.2d 17, 21-22 (1st Cir.1992). In any event, neither the cases that Berkovitz cites nor Rule 56 imposes an obligation on the subject of a sua sponte summary judgment ruling to move for reconsideration in order to preserve its claims on appeal. We therefore refrain from penalizing Key Bank and Schiavi for their purported oversight. Because the district court failed to afford the cross-Appellants any opportunity to oppose its grant of summary judgment for PIN, Phillips, and Pardilla, we hold that this ruling cannot stand.
 
 D. Emotional Distress
 
 112
 The district court awarded PIN summary judgment on Palmer's claims for both intentional and negligent infliction of emotional distress deriving from the two press conferences held in September 1994. In his Brief, Palmer merely adverts to the issue of whether the district court properly granted summary judgment on these two claims. Specifically, Palmer mentions this issue only in the table of contents and a single heading of his Brief. Other than these floating references, Palmer never makes any argument in his principal brief concerning either intentional or negligent infliction of emotional distress. "It is settled in this circuit that issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned." Ryan v. Royal Ins. Co., 916 F.2d 731, 734 (1st Cir.1990); see also Williams v. Poulos, 11 F.3d 271, 285 (1st Cir.1993).
 
 
 113
 We recognize that, in its Reply Brief, PIN notes in passing the fact that the district court "correctly" ruled against Palmer and awarded summary judgment to PIN on the emotional distress claims that Palmer mentioned in his counterclaim. In his Reply Brief, Palmer articulates a "response" to PIN concerning the emotional distress claims and devotes four pages to the argument that the district court improperly granted PIN summary judgment on these claims. As we have stated previously, "relief from an appellate court, requested for the first time in a reply brief, is ordinarily denied as a matter of course." Aulson v. Blanchard, 83 F.3d 1, 7 (1st Cir.1996); see also Indian Motocycle Assocs. v. Massachusetts Hous. Fin. Agency, 66 F.3d 1246, 1253 n. 12 (1st Cir.1995). The general rule set forth in Aulson and Indian Motocycle applies to this case. We therefore refrain from evaluating the arguments that Palmer raises for the first time in his Reply Brief.
 
 E. Supplemental Jurisdiction
 
 114
 The final issue confronting us is whether or not the district court properly exercised and now retains jurisdiction over the state law claims at issue in this case. 28 U.S.C. § 1367(a) provides: "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Section 1367(a)'s discussion of supplemental jurisdiction embraces both pendent and, more importantly for our purposes, ancillary jurisdiction. See Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1175 n. 8 (1st Cir.1995); Vera-Lozano v. International Broadcasting, 50 F.3d 67, 70 (1st Cir.1995).
 
 
 115
 In this case, the district court exercised original jurisdiction pursuant to 28 U.S.C. § 1331 because PIN's primary claim arose under 25 U.S.C. § 81. The district court correctly exercised jurisdiction to hear the Appellees' counterclaims because state and federal claims form part of the same constitutional case if they "derive from a common nucleus of operative fact" or "are such that ... would ordinarily be expected to [be] tr[ied] ... in one judicial proceeding." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); see also Baker v. Gold Seal Liquors, 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974) (finding ancillary jurisdiction when counterclaim arises out of the "same transaction or occurrence" as the underlying claim); Rodriguez, 57 F.3d at 1175-76 (quoting Gibbs, 383 U.S. at 725, 86 S.Ct. at 1138). As the Magistrate Judge noted in this case, "the truth or falsity of the statements [made at the press conferences] for purposes of the defamation claim ... turn[s] on the same 'aggregate of operative facts' as the original claim."[33] Penobscot Indian Nation v. Key Bank, No. 94-0212-B, at 2 (D.Me. Nov. 10, 1994); see also Painter v. Harvey, 863 F.2d 329, 333 (4th Cir.1988) (finding counterclaim for defamation fell within the ancillary jurisdiction of the district court); Pochiro v. Prudential Ins. Co., 827 F.2d 1246, 1251 (9th cir.1987) (finding that if "defamatory statements are sufficiently related to [sic] subject matter of the original action," defamation claim constitutes a compulsory counterclaim).
 
 
 116
 Although our affirmance of the district court's ruling with respect to § 81 eliminates the sole federal claim conferring original jurisdiction pursuant to 28 U.S.C. § 1331, the district court has discretion to hear the remaining state law claims at issue. "In a federal question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction, but, rather, sets the stage for an exercise of the court's informed discretion." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 256-57 (1st Cir.1996) (citing 28 U.S.C. § 1367(c)(3)). As the Roche court pointed out, "the trial court must take into account concerns of comity, judicial economy, convenience, fairness, and the like" in making this decision. Id. at 257. This determination necessitates an evaluation of the facts peculiar to each case.[34]
 
 
 117
 We emphasize that the decision to retain or disclaim jurisdiction over the remaining state law claims at issue in this case lies in the broad discretion of the district court. See Vera-Lozano, 50 F.3d at 70; Martinez v. Colon, 54 F.3d 980, 990 (1st Cir.) (finding that "once the court determined so far in advance of trial that no legitimate federal question existed, the jurisdictional basis for plaintiff's pendent claims under Puerto Rico law evaporated"), cert. denied, --- U.S. ----, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995). 28 U.S.C. § 1367(c) specifically provides that the district court may refuse to exercise supplemental jurisdiction over a state law claim if the claim "raises a novel or complex issue of State law," if the claim "substantially predominates over the claim or claims over which the district court has original jurisdiction," or if "the district court has dismissed all claims over which it has original jurisdiction."
 
 Conclusion
 
 118
 These appeals present many interesting issues. We find the question of § 81's applicability to the transactions at issue in this case particularly important in light of the evolution of federal Indian law and of the marketplace in which Indian tribes actively participate. Our conclusion that § 81 does not apply either to the Settlement Agreements or to the underlying agreements governing the parties' business relations reflects our determination not simply to dovetail with those authorities that have offered persuasive interpretations of § 81 before us, but further to reach a logical conclusion that promotes the interests of Indian tribes as they grapple with modern economic realities. We believe that in so doing we also give effect to the intentions of those who adopted § 81 in 1872.
 
 
 119
 We affirm in part, reverse and vacate in part, and remand to the district court for further proceedings consistent with this opinion. Costs to Appellees and cross-Appellants.
 
 
 
 *
 Of the District of Massachusetts, sitting by designation
 
 
 [1]
 Prior to the purchase, TAM informed PIN that Palmer had been the president of SHC. PIN also knew both that Palmer and his wife owned Palmer Development and that Palmer Development engaged in business activities similar to those of SHC
 
 
 [2]
 The Area Director of the Eastern Area Office of the Bureau of Indian Affairs, George Big Eagle, approved the transfer of the Holden Lot to Key Bank pursuant to Title IV of the Indian Financing Act of 1974, 25 U.S.C. §§ 1451-1543, which forbids, without written consent, any transfer or disposal of a project being improved with federal grant funds within three years of the use of such funds
 
 
 [3]
 Burlington Homes of New England, a subsidiary of CWC, manufactured mobile homes. SHC, Schiavi Homes, and Palmer Development all sold homes that Burlington manufactured
 
 
 [4]
 The record does not reveal the exact duration, scope, or findings of the investigation. Andrews testified that he provided the Maine Attorney General's office with a three page report summarizing his findings, but he did not divulge the report's contents to PIN. No party submitted this report into evidence; in fact, it is not apparent from the record that the results of the investigation were set out in writing or were made known to the public. It is clear, however, that no criminal proceedings of any kind resulted from Andrews' investigation
 
 
 [5]
 PIN's complaint also alleged the following: (1) breach of duty of good faith and fair dealing (against Key Bank, CWC, SHC, Burlington, Schiavi, Palmer, and Palmer Management); (2) breach of contract (against Schiavi); (3) misrepresentation (against CWC, SHC, Burlington, Schiavi, and Palmer); (4) fraud (against Bernstein); (5) negligence (against Bernstein); (6) breach of fiduciary duty (against Key Bank, Palmer, and Palmer Management); and (7) RICO violations (against Key Bank, CWC, Burlington, Bernstein, Schiavi, Palmer, Palmer Management, and Palmer Development)
 
 
 [6]
 The Palmer Defendants immediately filed a motion for reconsideration, which the district court subsequently denied See Penobscot Indian Nation v. Key Bank, Civ. No. 94-0212-B, 1 (D.Me. Dec. 13, 1995)
 
 
 [7]
 PIN did not appeal the adverse judgment respecting either its RICO claims or its other claims against Bernstein. Cross-Appellants did not appeal the district court's sua sponte ruling as to punitive damages
 
 
 [8]
 In addition to technical amendments to § 81, Congress passed the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, which provides in part: "The authority of the Secretary under section 81 of this title, relating to management contracts regulated pursuant to this chapter, is hereby transferred to the [National Indian Gaming] Commission." 25 U.S.C. § 2711(h)
 
 
 [9]
 At oral argument, PIN informed us that the Holden Lot constitutes the sole tract of land at issue in this case, and, thus, the only piece of Indian land to which § 81 could apply
 
 
 [10]
 We use the terms "Indian trust lands" and "Indian tribal lands" interchangeably because we have not located any authority that draws a distinction between these terms that is material for our purposes. See, e.g., Black's Law Dictionary 772 (1990); Felix S. Cohen's Handbook of Federal Indian Law 35-36, 476 (Rennard Strickland et al. eds., 1982); Reid P. Chambers & Monroe E. Price, Regulating Sovereignty: Secretarial Discretion and the Leasing of Indian Lands, 26 Stan. L.Rev. 1061, 1061 (1974) (referring to Indian lands delineated "restricted" in 25 U.S.C. § 415 as "Indian trust land")
 
 
 [11]
 25 U.S.C. § 1724(d)(3) provides: "Land or natural resources acquired outside the boundaries of [Penobscot Indian Territory] ... shall be held in fee by the respective tribe or nation, and the United States shall have no further trust responsibility with respect thereto." 25 U.S.C. § 1722(j) defines Penobscot Indian Territory as "those lands as defined in the Maine Implementing Act." The Maine Implementing Act defines Penobscot Indian Territory as the Penobscot Indian Reservation and "[t]he first 150,000 acres of land acquired by the secretary for the benefit of the Penobscot Nation" as further defined in this section. Me.Rev.Stat. Ann. tit. 30, § 6205(2)(B) (1993). The Holden Lot does not fall within either the Penobscot Indian Reservation or the remaining area that § 6205(2)(B) designed as current or potential Penobscot Indian Territory
 
 
 [12]
 It is noteworthy that the phrase "Indian country" refers to "all lands set aside by whatever means for the residence of tribal Indians under federal protection, together with trust and restricted Indian allotments." Cohen's Handbook at 34; see also United States v. John, 437 U.S. 634, 648-50, 98 S.Ct. 2541, 2548-49, 57 L.Ed.2d 489 (1978). The phrase "as Indian lands are held" is read "simply to state the United States will hold title in trust for the tribe." Cohen's Handbook at 476. These definitions would seem to indicate that "Indian country" and "Indian lands" encompass Indian trust lands but not Indian fee lands
 
 
 [13]
 Our determination to further consider the nature of Indian land ownership during this time in order to properly interpret the phrase "relative to [Indian] lands" would be appropriate even if we read Senator Harlan's statement in the disjunctive, rather than in the conjunctive as the sentence was recorded. That is, if we read the phrase "relating to the land or annuities that they hold under or derive from the United States" so that the qualifying statement "that they hold under or derive from the United States" qualifies only the word "annuities" but not the words "the land," we still would have learned little more concerning the definition of "Indian lands." Such a reading, though tortured, would resolve the ambiguity between the drafters' two statements and would tend to point to a broader definition of the terms "Indian lands," but it would not dispose of our inquiry into the meaning of the phrase "relative to [Indian] lands."
 
 
 [14]
 It was not until the legal relationship between Indian tribes and the federal government evolved dramatically in the twentieth century that legislation regulating Indian tribes' real property routinely distinguished between restricted and unrestricted tribal lands. See, e.g., 28 U.S.C. § 1360(b) (1953) (referring specifically to the "alienation, encumbrance, or taxation of any real or personal property ... that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States"); 25 U.S.C. § 415 (1955) (referring specifically to "restricted Indian lands"). Modern statutes routinely distinguish between Indian trust lands and Indian fee lands. See, e.g., 25 U.S.C. § 1724(d)(3) (1980) (distinguishing between Indian trust lands and Indian fee lands, and indicating that the United States does not have "trust responsibility" with respect to the latter); 25 U.S.C. § 1466 (1974) (indicating that Indian tribes can purchase real property "without any restriction on alienation, control, or use")
 
 
 [15]
 The Secretary of the Interior's duties pursuant to the text of § 81 subsequently have been delegated to the appropriate Area Director of the Bureau of Indian Affairs. See Reorganization Plan No. 3 of 1950, 5 U.S.C. § 903(a)(5) & note; Order of the Secretary of the Interior, Nos. 3150 & 3177, Amend. No. 3 (Dec. 16, 1996); 10 B.I.A.M. Bulletins 13, 9409, & 9602
 
 
 [16]
 We note that when the land at issue constitutes Indian fee land it is difficult for the subject matter of the contract to derive a special benefit from the Indian tribe's sovereignty because Indian tribes do not have the same powers and privileges with respect to Indian fee lands that they do in the context of Indian trust lands. See Narragansett Indian Tribe v. RIBO, Inc., 686 F.Supp. 48, 50 (D.R.I.1988), aff'd on other grounds, 868 F.2d 5 (1st Cir.1989); Cohen's Handbook at 232-57
 
 
 [17]
 Perhaps recognizing the Narragansett decision as an anomaly, at least one circuit court has interpreted Narragansett as "simply hold[ing] that bingo management agreements involve services within the meaning of [§ 81]." Bacon, 21 F.3d at 212
 
 
 [18]
 We recognize that the Supreme Court determined that the Nonintercourse Act, 25 U.S.C. § 177, applied to land that the Pueblo Indian tribes of New Mexico held in fee simple. See United States v. Candelaria, 271 U.S. 432, 440-44, 46 S.Ct. 561, 562-64, 70 L.Ed. 1023 (1926); see also United States v. Sandoval, 231 U.S. 28, 45-48, 34 S.Ct. 1, 5-7, 58 L.Ed. 107 (1913) (finding that Congress could restrict the alienation of land that New Mexico Pueblo Indians held in fee simple). The Pueblo Indians at issue in Candelaria and Sandoval held their lands in fee simple under both Spanish and Mexican law before the United States gained control over New Mexico. See Candelaria, 271 U.S. at 442, 46 S.Ct. at 563; Sandoval, 231 U.S. at 44-45, 34 S.Ct. at 5. First the Spanish and then the Mexican authorities, however, retained the authority to restrict the alienation of these lands. See Candelaria, 271 U.S. at 442, 46 S.Ct. at 563; Sandoval, 231 U.S. at 44-45, 34 S.Ct. at 5. We believe that the situation in this case, in which PIN purchased land in fee simple for investment purposes, differs substantially from that in both Candelaria and Sandoval, in which the tribes held their ancestral tribal lands in a modified version of fee simple under Spanish and Mexican rule. We note, however, that several courts, relying on Candelaria and Sandoval, have found § 177 applicable to lands that other Indian tribes have purchased in fee simple. See Alonzo v. United States, 249 F.2d 189, 196 (10th Cir.1957); United States v. 7,405.3 Acres of Land, 97 F.2d 417, 422 (4th Cir.1938). Given Alonzo 's paucity of analysis and outdated paternalism (the court adopted the notion that Indians are " 'a simple, uninformed people, ill-prepared to cope with the intelligence and greed of other races,' " see id. (quoting Candelaria, 271 U.S. at 442, 46 S.Ct. at 563)), we do not find this decision persuasive. This conclusion applies equally to 7,405.3 Acres of Land
 The situation in this case, moreover, differs substantially from that in Alonzo and 7,405.3 Acres of Land. As opposed to the land in question in those cases, Congress disavowed trust responsibility over the land encompassing the Holden Lot. See 25 U.S.C. § 1724(d)(3). In Lummi Indian Tribe v. Whatcom County, 5 F.3d 1355, 1359 (9th Cir.1993), the Ninth Circuit took issue with Alonzo and 7,405.3 Acres of Land and ruled that "parcels of land approved for alienation by the federal government and then reacquired by the Tribe did not then become inalienable by operation of the Nonintercourse Act." See also Federal Power Comm'n v. Tuscarora Indian Nation, 362 U.S. 99, 110-15, 80 S.Ct. 543, 550-53, 4 L.Ed.2d 584 (1960) (determining that lands that Indian tribe purchased in fee simple were not subject to federal oversight pursuant to Federal Power Act, 16 U.S.C. § 797(e), because United States neither owned these lands nor owned an interest in these lands). The lands at issue in Lummi Indian Tribe and Tuscarora Indian Nation were similar to the Holden Lot in that the tribes purchased these lands in fee simple. See Lummi Indian Tribe, 5 F.3d at 1357; Tuscarora Indian Nation, 362 U.S. at 105-06, 80 S.Ct. at 547-48.
 
 
 [19]
 Key Bank urges us to rule that the Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721-1735, implicitly repealed § 81 with respect to PIN generally. Although § 1724 provides that several statutes, including 25 U.S.C. § 177, no longer apply to PIN, it makes no mention of § 81. If Congress desired to repeal completely § 81 with respect to all PIN real property it could easily have done so, as it did with § 177. Cf. Bailey v. United States, --- U.S. ----, ----, 116 S.Ct. 501, 507, 133 L.Ed.2d 472 (1995) (specifying that if Congress desired to alter a statute it specifically would have done so); Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (" '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' ") (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir.1972)); Hirschey v. F.E.R.C., 760 F.2d 305, 308 (D.C.Cir.1985) (indicating that Congress understands how to effect such results); see also Altheimer, 983 F.2d at 805 (explaining that Congress has neither explicitly nor implicitly overruled § 81). We thus do not find that the Maine Indian Claims Settlement Act implicitly repealed § 81 with respect to all PIN land
 
 
 [20]
 The fact that Congress explicitly determined that the Nonintercourse Act does not apply to PIN further distinguishes this case from the cases in which courts have interposed a trust obligation in regard to real property that Indian tribes have purchased in fee simple. See Alonzo, 249 F.2d at 196; 7,405.3 Acres of Land, 97 F.2d at 422-23. Congress never stated that the Nonintercourse Act did not apply to the real property at issue in Alonzo or 7,405.3 Acres of Land
 
 
 [21]
 One proponent of § 81 described the statute as follows: "If it is enacted and becomes part of the law it will be the best shield, the best protection, and the best security for the rights and the helplessness of these sons of the forest that has ever been devised by American legislation or American humanity." Cong. Globe 41st Cong., 3d Sess. 1483, 1484 (daily ed. Feb. 22, 1871) (comments of Senator Davis)
 
 
 [22]
 Even if such a release did preclude a party's action to invalidate the underlying agreement pursuant to § 81, as in the instant case, § 81's qui tam provision would permit another party to bring suit in the name of the United States to invalidate the underlying agreements if these underlying agreements did not bear the Secretary's approval. See Tribal Development, 49 F.3d at 1212; United States ex rel. Yankton Sioux Tribe v. Gambler's Supply, Inc., 925 F.Supp. 658, 668-69 (D.S.D.1996)
 
 
 [23]
 PIN refers both to the Asset Purchase Agreement and to "associated contracts and documentation" as being void ab initio pursuant to § 81. The Partnership executed a NonCompetition and Consulting Agreement with John Schiavi on December 30, 1996. Although this Agreement did provide for services, in the form of consulting duties, it never mentioned and did not relate to any Indian lands. The non-competition agreements that the Partnership executed with CWC similarly did not pertain to any Indian lands. Section 81, therefore, does not apply to these "associated contracts and documentation."
 
 
 [24]
 As previously noted, the parties to the Partnership Agreement submitted this Agreement for the Secretary's approval pursuant to § 81. The Secretary specifically determined that § 81 did not pertain to the Agreement
 
 
 [25]
 The Assignment of Lease executed on December 1, 1988, transferring Schiavi Homes' entire interest in the Lease, and particularly the option to purchase the Holden Lot, to Key Bank as additional collateral for the repayment of its Guaranteed Loan in the amount of $3,500,000 did not require Secretarial approval under § 81. This agreement did not entail any services and pertained only to the Holden Lot not to PIN's trust lands. On July 20, 1989, moreover, PIN secured Bureau of Indian Affairs approval for this Assignment pursuant to Title IV of the Indian Financing Act of 1974, 25 U.S.C. §§ 1521-1524
 
 
 [26]
 The district court devoted the majority of its analysis to the issue of whether a party may recover attorney's fees for the breach of a settlement agreement's release of claims. The district court found that a party could not recover such attorney's fees in the defense of a suit that itself constituted a breach of a settlement agreement. See Penobscot Indian Nation v. Key Bank, Civ. No. 94-0212-B, at 6 (D.Me. Dec. 13, 1995). Neither Palmer nor Palmer Management raises this issue on appeal
 
 
 [27]
 Despite the fact that this case raises a federal question, and thus that the district court exercised jurisdiction pursuant to 28 U.S.C. § 1331 not 28 U.S.C. § 1332, we apply Maine law to the remaining claims because they all involve state law and raise substantive rather than procedural issues of law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); Walton v. City of Southfield, 995 F.2d 1331, 1343 (6th Cir.1993) (applying state law in federal question case involving pendent state claims)
 
 
 [28]
 We recognize that certain jurisdictions may permit a party to sue for both specific performance and consequential damages in the case of the breach of a settlement agreement. See, e.g., Berryhill v. Hatt, 428 N.W.2d 647, 658 (Iowa 1988); see also Restatement (Second) of Contracts § 281(3) (1981). Other jurisdictions, however, apparently require a party to select between specific performance and monetary damages in the event of a breach of a settlement agreement. See, e.g., TNT Marketing, Inc. v. Agresti, 796 F.2d 276, 278 (9th Cir.1986). Even those jurisdictions that appear to afford an aggrieved party the right to sue both for specific performance and for consequential damages are not consistent in their approach. In Village of Kaktovik v. Watt, 689 F.2d 222 (D.C.Cir.1982), for instance, the District of Columbia Circuit first stated: "Upon breach [of a settlement agreement] by one party, the other party may obtain damages or specific performance as appropriate." Id. at 230; see also Jackson v. Washington Monthly Co., 569 F.2d 119, 120 n. 1 (D.C.Cir.1977). The Watt court then declared: "Upon anticipatory breach of a settlement contract ... the non-breaching party m[ay] choose ... to enforce the agreement and perhaps also recover damages resulting from its breach...." Id. at 231. We therefore believe that further exposition of this issue, see Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir.1996) (explaining that when a state's highest court has not propounded on an issue in question, "we seek guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law"), would be of little benefit in this case
 
 
 [29]
 As it did below, Key Bank argues that the following statements, contained in the press release that Marcello drafted and disseminated, are defamatory: (1) the statement claiming that "money ... had been stolen from" PIN; (2) the statement asserting that Key Bank "conspired and acted to defraud the Penobscot Nation;" (3) the statement explaining that "the conduct of Key Bank ... resulted in the Penobscot Nation entering into an improvident and unconscionable partnership investment" pursuant to which it "relinquished its right, its land, and its money to those who plundered the Penobscot Nation, lied to the Penobscot Nation and its members, and stole from the Penobscot Nation and its members;" (4) the statement positing that "bad acts, fraud, and bad faith committed by Key Bank ... against the Penobscot Nation is a far greater conspiracy than could have been outlined" in the press conference; and (5) the statement insisting that PIN "suffered grave financial losses and later learned that they have been victimized, manipulated, lied to, and used by Key Bank."
 
 
 [30]
 Marcello contends that his statements are privileged because they fairly and accurately report a judicial proceeding. The privilege that Marcello attempts to adopt at this point pertains to defamatory statements contained in reports of judicial proceedings prepared by reporters. See Brown v. Hearst Corp., 54 F.3d 21, 25 (1st Cir.1995); Jones v. Taibbi, 400 Mass. 786, 512 N.E.2d 260, 266 (1987). Regardless of the fairness or accuracy of Marcello's publications, he is not a reporter. In any event, Maine does not appear to have adopted the "reporter privilege" to this date, and we will not speculate as to the future development of Maine law
 
 
 [31]
 Marcello must establish sufficient evidence to support a factual conclusion that Key Bank is a public figure. See Restatement (Second) of Torts § 580A cmt. e (1977) ("For a privilege created by the law to apply, the person who seeks to dispel the seemingly tortious character of his conduct normally has the burden of raising the issue of the privilege and proving the existence of its elements.")
 
 
 [32]
 Although Key Bank did have the opportunity to present its position with respect to Marcello, it did not in the case of PIN, Phillips, and Pardilla because none of these parties moved for summary judgment. Key Bank's argumentation may have differed little in response to summary judgment motions filed by PIN, Phillips, and Pardilla, given the similarity of the facts and circumstances relating to its claims against these parties. The nature of PIN, Phillips, and Pardilla's relationship to the conduct at issue as well as the defenses that these parties now assert in response to Key Bank's defamation claims, however, support Key Bank's argument that it would have responded differently to these parties had the district court afforded it an opportunity to do so. See Stella, 4 F.3d at 56 (noting the special preparation necessary to defend a motion for summary judgment). Significantly, Key Bank did not present evidence, either in its written or in its oral defense to Marcello's summary judgment motion, concerning PIN, Phillips, or Pardilla. See Berkovitz, 89 F.3d at 31 n. 8 (reasoning that plaintiff at issue in Berkovitz did not have an opportunity to put forth evidence relating to summary judgment motion). We thus include Key Bank in our disposition of the district court's sua sponte defamation rulings
 
 
 [33]
 We do not distinguish between the counterclaims of Schiavi, Palmer, Palmer Development, Palmer Management, and Key Bank against PIN and the counterclaims of Key Bank against Marcello, Phillips, and Pardilla, for purposes of our discussion of supplemental jurisdiction. All of the counterclaims satisfy the "basic transaction-or-occurrence test that is used to distinguish between compulsory and permissive counterclaims." 6 Charles Alan Wright & Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1404, at 32 (2d ed.1990). Supplemental jurisdiction exists for all of the counterclaims in this case
 
 
 [34]
 Finding that the district court properly considered the state law claims at issue despite the fact that it had disposed of the federal claim supporting original jurisdiction, the Roche court emphasized the following: "The litigation had matured well beyond its nascent stages, discovery had closed, the summary judgment record was complete, the federal and state claims were interconnected, and powerful interests in both judicial economy and fairness tugged in favor of retaining jurisdiction." 81 F.3d at 257